unsealed 4/4/01 m 1:00

**SEALED**

# United States District Court

_____ MIDDLE _____ DISTRICT OF _____ NORTH CAROLINA _____

UNITED STATES OF AMERICA

v.

JAMES ANTHONY SAVAGE,
also known as Mario James Racanelli, Egisto Grandoni,
Grandoni Egisot, Robert Toliano, M. John Delano, Greg
Eric Masonotti, John Racanelli and Mark Racanelli

**CRIMINAL COMPLAINT**

CASE NUMBER: 1:01/m/100-1

FILED JAN - 4 2001 IN THIS OFFICE Clerk U. S. District Court Greensboro, N. C. By _____

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

From on or about 1996, up to and including the present, in Forsyth County, in the Middle District of North Carolina, James Anthony Savage did, having devised and intended to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, for the purpose of executing said scheme and artifice to defraud did use interstate wire communication facilities to transmit sounds; in violation of Title 18, United States Code, Section 1343.

From on or about 1996, up to and including the present, in Forsyth County, in the Middle District of North Carolina, James Anthony Savage did knowingly engage in a monetary transaction in criminally derived property of a value over $10,000, which monies were derived from a specified unlawful activity, that is, wire fraud, in violation on Title 18, United States Code, Section 1343; in violation of Title 18, United States Code, Section 1957.

I further state that I am a Special Agent with the Internal Revenue Service, Criminal Investigation Division, and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof.   X Yes __ No

_Merri Lynne Conrad_
Signature of Complainant

Sworn to before me, and subscribed in my presence

January 4, 2001
Date

Russell A. Eliason, United States Magistrate Judge
Name and Title of Judicial Officer

at Winston-Salem, North Carolina
City and State

_Russell A. Eliason_
Signature of Judicial Officer

## AFFIDAVIT

Merri L. Conrad, Special Agent with the Criminal Investigation Division (CID) of the Internal Revenue Service, (IRS), United States Treasury Department, first being duly sworn, deposes, and says:

### Introduction

1. I am a "federal law enforcement officer" within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure.

2. I am a Special Agent with the Internal Revenue Service (IRS), Criminal Investigation Division, and have been so employed since July 1992. Before then, I was employed as a Revenue Officer of the Internal Revenue Service, Collection Division, for approximately one and one-half years. In connection with both positions, I have received training in Financial Investigative Techniques.

3. My duties include investigations of alleged criminal violations relating to Financial Transaction Money Laundering (Title 18, United States Code, Sections 1956 and 1957), the Bank Secrecy Act (Title 31, United States Code, Sections 5313 and 5324), the Internal Revenue Code (Title 26, United States Code) and related offenses. As a Special Agent, I have conducted or participated in numerous investigations of alleged criminal violations of these statutes.

4. I make this application for a warrant to show there is probable cause for the belief that James Anthony Savage, also known as Mario J. Racanelli, John Racanelli, Mark Racanelli, Grandoni Egistot, Egisto Grandoni, Robert Toliano, M. John Delano, and Greg Eric Masonotti, has been active in a scheme to defraud which utilized wire communications in interstate commerce, in violation of Title 18, United States Code, Section 1343, and engaged in multiple financial transactions of more than $10,000, involving the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

### Scheme to Defraud Victim 1

5. In August, 1999, a North Carolina resident whom I will herein refer to as "Victim 1," so as to protect her at this stage from publicity, filed a complaint with her local police department. In a number of interviews conducted between August 25, 1999, and November 12, 1999, with law enforcement personnel, including your affiant, Victim 1 gave detailed information about various activities in which Savage had been engaged, and provided financial records and other documents concerning her purported investments with Savage. At the time, Victim 1 knew Savage as "Mario J. Racanelli." Victim 1 provided the following information, much of which has been corroborated by law enforcement officers. Victim 1 is fully prepared to testify about these matters.

6. In November, 1996, Savage made a 'cold call' to Victim 1 to inquire about ballroom dance lessons. Victim 1 was in her late sixties, Savage is now thirty-two. (Victim 1 states that he told her he was in his late thirties.) According to Victim 1, they developed a friendship and, later,

a romantic relationship. Savage told Victim 1 that he had worked in the communications business and wanted to open his own communications store. He told Victim 1 he wanted to open the store as a joint venture. Savage and Victim 1 looked at a number of locations which Savage discussed as being potential business locations. In January, 1997, Savage asked Victim 1 to invest $ 3,000 which would be applied toward the purchase of fixtures for his purported store. Victim 1 gave him the money.

7. Over the next two and one-half years, Savage repeatedly asked Victim 1 for additional money as investments in supposed businesses which he claimed to be operating. Over the course of those years, Victim 1 invested well over $ 4,500,000 with Savage in his alleged business ventures.

8. Savage gave various explanations to Victim 1 over the course of time when he was needing her to invest in his business endeavors. Savage said that he needed the money to open, operate, purchase business equipment for, or to hire and pay workers, and various other work-related expenses, for his supposed business ventures.[1] Savage always promised that Victim 1 would earn handsome profits from these investments. Victim 1 reports that she repeatedly told him that she merely wanted to recoup her investment and the interest or dividends it would have earned had she left the money in the bank. Savage assured her that she would receive that and more.

9. As noted, at first Savage said he was in the communications business. At some point, he told Victim 1 that he had agreed to help out a Russian friend who was also in the communications business. Eventually, Savage informed Victim 1 that, in fact, he had fled from Tennessee, where he and his assistants had been working, because what they were doing there was illegal. He explained to Victim 1 that they had been disposing of nuclear waste which had been brought to their location in tank trucks. Savage said that the government had facilities for the nuclear waste to be dumped but was paying Savage under the table for his supposed services. Some of the money Victim 1 invested with Savage was supposedly used to purchase equipment needed in this illegal dumping business. In the weeks just before my first interview with Victim 1, Savage again contacted her, seeking additional funds to replace some equipment that had supposedly been stolen and to pay his and his assistants' travel expenses.

10. Savage repeatedly told Victim 1 that she would make profits from her investments, that he would repay her all her money with interest, and that he would pay the taxes on the capital gains she incurred as she was taking her money out of her trust fund investments to give to him. Victim 1 invested the money with Savage to help him establish his own business. From his earnings from his businesses, Savage promised to repay Victim 1 the money she invested. In the final year, Savage continued to request funds, assuring Victim 1 that if only she were to make an additional investment, the project could be completed, and that he would then earn some fifteen to twenty-two million dollars. In the later stages, Victim 1 feared that if she did not give Savage the additional money he claimed he needed in order to complete the supposed project, she would lose all of the

---

[1] As set forth below beginning at Page 5, Savage had used a similar *modus operandi* to obtain monies from other victims. The amounts he had secured from each of the earlier victims was significantly smaller.

money that she had already invested. Victim 1 has little documentation about the character of her investments, for whenever she spoke with Savage about putting things in writing, he assured her that it would not be necessary and that she could trust him to take care of her. On numerous occasions, Savage asked Victim 1 to marry him.

11. Victim 1 made her investments by personal checks, official bank checks, wire transfers and currency. The money Victim 1 invested with Savage was delivered in varying ways over the years. On some occasions, she handed it directly to Savage. On other occasions, Victim 1 deposited it into an account Savage had in the name "Racanelli" at NationsBank (now Bank of America). There were times when he asked that she send the money via Federal Express. Funds sent via Federal Express were sent to hotels in several states including Georgia, Florida, Illinois, New York, Washington, Utah and Texas. Victim 1 stated that she was never physically at a business site supposedly owned by Savage nor in his residence, wherever that might be.

### Documentary Evidence Related to Victim 1

12. Victim 1 has provided bank, credit card, FedEx receipts, and other records to substantiate the amount and method(s) of her transfer of funds to Savage. Victim 1's BB&T and Southern Community Bank and Trust checking account records show that Victim 1 wrote checks totaling over $ 2,400,000 payable to "Mario Racanelli" during the period January 8, 1997, through August 6, 1999. She stated she deposited the majority of these checks directly into Savage's "Racanelli" NationsBank account. During the same period, Victim 1 wrote over $ 1,679,000 in checks payable to "Cash". Of these, checks totaling $ 1,597,000 had either Savage's bank account number or his initials, "MJR," (Mario J. Racanelli), written in the memo section of each check. Of the remaining checks made out to "cash" totaling over $ 81,000, Victim 1 states that the majority of this currency was also turned over to Savage.

13. Over the course of the same two and a half years, Victim 1's bank accounts show other withdrawals totaling over $ 1,390,000 which she states were further investments with Savage, given him in the form of currency or cashier's checks. I examined wire transfer records and found $ 384,000 was sent in various transfers from Victim 1's BB&T checking and trust accounts to the "Racanelli" NationsBank account.

14. In short, Victim 1's bank records show the withdrawal or transfer of funds totaling over $ 5,775,000 which corroborates her statements that she provided large sums of money to Savage. I have obtained the records of Savage's NationsBank account, in the name of "Mario Racanelli." Between January 1, 1997, through January 31, 2000, there were deposits into the account of approximately $ 4,115,000, of which over $ 2,840,000 was clearly provided by Victim 1, which had been deposited into the "Racanelli" account as either checks or wires transfers. Further, while the sources of cash deposits are always difficult to identify, during the same period of time, there were over $ 671,000 in cash deposits into the four NationsBank accounts to which Savage had access. (One in his name, two in the name of his wife, Margaret "Marnie" Handsman, and one in the name of Rich Offerings, Inc., a name under which Savage and Handsman claimed to do

- 3 -

business.) My review of AmSouth Bank and NationsBank records shows that Savage has rented a number of safe deposit boxes since 1996. It is probable that Savage's various safe deposit boxes have been used to safe-keep a considerable amount of the currency Victim 1 says she has given Savage and which is not reflected in the bank accounts to which Savage had access.

15. Victim 1 provided your affiant with a number of FedEx receipts. She asserted that these receipts were from packages she sent Savage which contained money he requested. The earliest FedEx airbill was dated May 5, 1997, and listed the recipient as "Mario Racanelli, Room 34A, Fairways Resort, 103 Palm River Boulevard, Naples, Florida." There were forty additional FedEx airbills with "Racanelli" as the recipient, and sent to him at hotels located in a number of states. I reviewed the FedEx records and travel-related records provided by Victim 1 and compared the relevant dates with the dates of numerous Currency Transaction Reports (CTRs) and bank records showing large currency withdrawals from Victim 1's accounts. The dates coincide in large part: in other words, I found large currency withdrawals which were dated the same day or just prior to the dates of many of the FedEx receipts or travel-related records.

16. Telephone records for Victim 1's two residential telephone numbers and for two of Savage's cellular telephone numbers show that numerous calls were made between the two numbers identified for each party. The earliest call made from Savage's cellular telephone to Victim 1's residence occurred on December 24, 1996. From that date through November of 1999, Savage's cellular records show over two thousand calls to Victim 1's numbers. During the same time, Victim 1's telephone records show that she was billed for almost three hundred calls to Savage's cellular number (910/336) 407-3426. It is believed that all of these calls were made from locations other than her residence. Any calls made from her residence to (910/336) 407-3426 were treated as local calls by her carrier.

17. Victim 1 gave your affiant tapes of her telephonic conversations with Savage which she recorded in September, October, and November, 1999. In those conversations, Savage repeatedly asked Victim 1 for additional money so as to complete some "job", implying that if she did not do so, she would lose all of the money that she had already invested. These conversations corroborate Victim 1's statements to affiant concerning her investments with Savage, the amount of money involved and her expectations that the money would be repaid. Savage spoke of some involvement with a Russian business partner, who was supposedly worth millions, and who would pay Savage fifteen to twenty-two million dollars upon completion of the job.

18. In an affidavit Savage submitted in connection with a civil suit, Savage acknowledged receiving Victim 1's money and other valuable property, but termed them as gifts, freely and voluntarily tendered by Victim 1 and received by him without expectation of repayment. According to Savage, Victim 1 gave him gifts, including substantial sums of money, expensive clothing, shoes, jewelry and other personal items, and permitted him to use her credit cards, among other things, so that he would continue to maintain a meretricious sexual relationship with her, and so that he would appear to be financially successful in the eyes of Victim 1's relatives and friends.

-4-

19. In summary, Victim 1's allegations are that she has invested millions of dollars in various of Savage's purported business schemes — a supposed communications business or some hazardous waste business. Victim 1's allegations are that she has been the victim of a bogus investment scheme involving Savage and the services of FedEx, a private or commercial interstate carrier, were used to transmit substantial sums of money constituting the proceeds of a fraudulent scheme.

### Savage Criminal History

20. Savage's criminal history dates back to January 17, 1990, when he was arrested by Statesville, North Carolina Police Department officers for fraud and fraud-related charges. Savage pled guilty to a charge of obtaining property by worthless checks and was sentenced to six months jail with two years probation.

21. Since that 1990 arrest and conviction, Savage has been arrested six additional times on fraud-related charges, including obtaining property by false pretense, credit card fraud, and theft, by six different law enforcement agencies in Ohio, New Jersey and North Carolina. In two of those cases, Savage was convicted and/or pled guilty and served time in jail. In an Ohio fraud case, on which Savage was ultimately arrested in his home on Pine Needle Road, Sarasota, (see page 12, below), the charges were dismissed after Savage paid in excess of $ 40,000 in restitution.

22. Savage was also arrested on March 23, 1991, in Ohio, for carrying a concealed weapon, and on January 26, 1993, in New York, for criminal possession of a weapon (a loaded gun).

23. On March 8, 2000, Savage was arrested in Sunny Isles Beach, Florida, on charges of trafficking in Rohypnol (Flunitrazepam, more commonly known as the "date rape" drug) and possession of a counterfeit driver license (a Florida driver license in the name "Mario Racanelli," of 1290 N. Palm Avenue, Sarasota, Florida). When Savage was first confronted by law enforcement officers, he was standing alongside a limousine. Upon announcing their presence, Savage ignored warnings and reached into the back seat of the limo. In the back seat, police found both the drugs and an open brown bag containing $ 12,228 in currency. Savage told the arresting officers that his name was "Grandoni Egistot," and gave the police two Canadian photo identifications (in names "Grandoni Egistot" and "Robert Toliano") and a Canadian Passport (in the name "Robert Toliano"). The false Florida driver's license was located in Savage's wallet. It was Savage's photograph in all the false identifications, in the names of Grandoni Egistot, Robert Toliano and Mario Racanelli. Sharon Taft, who identified herself as Egistot's girlfriend, told police that the brown bag was Egistot's. Those criminal charges are still pending in Florida state court.

### Prior, Simultaneous, and Subsequent Similar Fraudulent Criminal Conduct

- 5 -

Case 1:01-cr-00362-TDS   Document 1   Filed 01/04/01   Page 6 of 15

24.     During the course of this investigation I have learned of four additional female victims from whom Savage obtained money for the purpose of some apparently fictitious business endeavors.

### Communications Business Investment Fraud with Victim 2

25.     I have interviewed another woman from North Carolina to whom, so as to protect her at this stage from publicity, I shall identify as "Victim 2." She told me that she met Savage, whom she knew as "Mario Racanelli," around February of 1996. Savage told Victim 2 that he wanted to open a storefront to sell cellular phones and pagers or sell them out of his residence. Savage said that he planned to buy approximately sixty pagers at a cost of around $ 60 each and resell the pagers for $ 100 - $ 120 each. Savage asked Victim 2 to invest $ 4,000 - $ 5,000 in his plan to purchase pagers. He promised that he would double the investment within ninety days. In April or May, 1996, she obtained a consumer loan from Wachovia Bank for around $ 2,500 and had the cashier's check made payable to her and Savage.

26.     Savage was angry that she had gotten money in the form of a cashier's check. He told her he wanted to deal only in cash. Victim 2 said that Savage dealt in cash. Approximately one month after Victim 2 gave Savage the cashier's check, Savage told her that he did not have quite enough money to complete the deal, so she invested an additional $ 2,200. On June 6, 1996, she obtained a cash advance on her credit card to purchase a Wachovia official check for $ 2,200, which Victim 2 gave to Savage. Following this time, when Victim 2 asked Savage about the pager deal, he would just put her off by telling her that he was still working on the deal. Neither profits nor any of Victim 2's original investment were returned. (I have reviewed bank records for Savage's "Racanelli" NationsBank account, № 653172817, and verified the deposit of these two checks from Victim 2 into the account.)

27.     On March 21, 1997, Victim 2 filed a civil complaint in an effort to recover the $ 4,700 that she had invested with Savage. An officer of the local Sheriff's Department attempted to serve a related civil summons at Savage's residence, 1640 Woods Road, Apartment S, Winston-Salem, but was told by the woman who answered the door, (Savage was living with Handsman at the time), that he had left home and his whereabouts were unknown.

### Communications Business Investment Fraud with Victim 3

28.     On February 11, 2000, I interviewed a woman living in North Carolina who, to protect from possible publicity, I will call "Victim 3." Victim 3 knew Savage before he served time in prison. In December, 1995, after he was released, he told her that he wanted to start up a communication business. Savage explained to her that he wanted to get into the pager business and stated that he knew he could make the business work if he put up a good front in order to get financial "backers". He said that he was trying to get investors in South Carolina.

- 6 -

Case 1:01-cr-00362-TDS   Document 1   Filed 01/04/01   Page 7 of 15

29. Savage talked Victim 3 into opening several joint credit card accounts. He explained to her that he needed the cards to make it appear to his potential investors that he was successful. He promised that he would not charge anything on the cards. Victim 3 stated that they obtained several credit cards including a Sears Card, American Express, Citgo, Dillards, J.C. Penney and Radio Shack. At Savage's request, the name on the joint accounts was "Mario Racanelli." Savage explained that he wanted to change his name to Racanelli because of his arrest record and to keep his past from interfering with his ability to set up the business. Savage led Victim 3 to believe that they were going to have a long-term romantic relationship.

30. Savage asked if he could use her address for mail because he had had a problem with someone going through his mail and/or taking his money. She agreed and stated that Savage received credit card bills and cellular telephone bills at her address. (I have reviewed various banking records in the course of this investigation and found that on March 5, 1996, Savage, using the name "Mario Racanelli" opened a NationsBank account, № 653172817, in Winston-Salem, and used Victim 3's address as the address to which the monthly statements should be sent.)

31. In April of 1996, the credit card bills started arriving. At first, she just gave the bills to Savage without opening them. At some point, she became aware that Savage was not paying the bills, that the credit cards were "maxed out" and confronted him about it. He requested that she just make the minimum payment on the cards for a couple of months until he could get his business going. Savage told her that the purchases, which he had made, were items for his potential business investors.

32. Victim 3 gave Savage approximately $ 1,500 which was a loan payout from American General Finance. Savage told her that he needed the money to show his potential investors that he was solvent because they were apparently getting cold feet. Victim 3 never received her loan money back, nor did Savage honor the credit card debts he incurred. As a result of the debts which Savage had incurred on the credit cards and telephone in her name, Victim 3 filed for bankruptcy in December of 1996.

### Communications Business Investment Fraud With Victim 4

33. A North Carolina resident whom, to protect from possible publicity at this point, I shall refer to as "Victim 4," reported to your affiant that she met Savage, whom she knew as "Mario Racanelli," and his wife, Marnie, in September, 1996, at the Woods Apartments in Winston-Salem, North Carolina. Thereafter, Victim 4 became romantically involved with Savage.

34. Savage told her about an "investment opportunity" which would supposedly double her investment within ninety days. Savage told Victim 4 that his family owned and operated lucrative communications distributorships along the East Coast, from New York to Florida, making billions of dollars a year. Savage offered to let her invest in a pager/cellular telephone purchase, which he was getting ready to make. He guaranteed that, even if she did not make the profit that he promised, her initial investment would be secure. Savage asked Victim 4 to invest $ 10,000 but

- 7 -

Victim 4 told him that she only had about $ 3,000 in her savings account. Savage suggested that she get a cash advance so that she could invest at least $ 5,000.

35. On January 29, 1997, Victim 4 cashed in a $ 1,700 Certificate of Deposit and obtained a $ 3,000 cash advance to get the money, and gave a total of $ 5,000 currency to Savage. Savage told her the funds for the purchase had to be in cash. He said that the company with which he was dealing needed cash and that they did not want a check. She asked Savage if there was anything illegal about the transaction. Savage assured her that there was nothing illegal involved, that it was a family-owned business.

36. In late February/early March, 1997, Victim 4 became concerned that Savage may have "scammed" her. When she told Savage her fears, he became angry and loud. Savage warned Victim 4 that if she said any bad things in the town where he had business interests that he would have the family's attorneys take care of her. Victim 4 stated that she was very frightened of Savage by this time. She brought up the possibility of reporting Savage to the police. He responded that if she did, he would take care of her. Victim 4 believed that he was threatening to return and physically harm her.

37. After ninety days, Savage answered her inquiry concerning when her investment would be repaid. Savage told her that he had the money and that they had made a really good profit. Savage set an appointment to meet with her in early May, 1997, to return her investment (principal and proceeds) but failed to appear. Since mid-May, 1997, Victim 4 has had no further contact with Savage.

### Communications Business Investment Fraud With Victim 5

38. Fellow law enforcement personnel active in this investigation have spoken with a lady who is a resident of a small town in Georgia whom I shall refer to as Victim 5. She met Savage, whom she knew as "Mario Racanelli," around Labor Day, 1996. He told her that he was involved in telephone communication work in Atlanta but lived in Winston-Salem, North Carolina. He told her that for $ 3,000 she could buy a case of pagers through him because he had an overseas contact. He offered to then resell the pagers for her, stating that she would thus double her money in a month. Victim 5 gave him a cashier's check in the amount of $ 3,200. Savage promised to repay Victim 5 $ 5,500 on December 26, 1996. Afterwards, Savage called Victim 5 requesting more money and told her that if he did not get the money that his life would be in danger. She refused and later when she questioned Savage about the money that he owed her, Savage became angry and told her that she didn't know the contacts that he had. Victim 5 never received any of her money back. (I have reviewed bank records for Savage's NationsBank account, № 653172817, and verified the deposit of Victim 5's cashier's check, payable to "Mario Racanelli, d/b/a IMMTEL," on November 27, 1996.)

- 8 -

### Jewelry Investment Fraud Scam With Victim 6 and Victim 7

39.     In August, 2000, I spoke with a Victim 6 and his wife, both residents of Florida, who invested $ 205,000 with Savage, whom they knew as "Mario Racanelli." Savage told the Victim 6s he was retired from the jewelry business but could still buy uncut emeralds at wholesale prices through contacts he had in the business. The Victim 6s agreed to invest in a plan in which Savage, would purchase raw emeralds, have them cut and then sold. Savage promised the Victim 6s a forty-percent return on their initial investment (in addition to the principal being returned). Savage promised the Victim 6s that their money would not be at risk because their money would remain in his account until he had examined the emeralds and was satisfied with their quality. Victim 6 invested his money in the winter of 1999-2000. An acquaintance of Victim 6, Victim 7 , invested an additional $ 75,000 in the same venture at about the same time.

40.     Savage told Victim 6 that he earned seven million dollars a week through his stocks and business dealings.

41.     Victim 6 said that Savage's wife, Marnie, knew of his emerald investment with Savage. He heard Savage talk of the investment to Handsman. When Victim 6 gave Savage Victim 7's $ 75,000 (in currency, in a cardboard box), he believed that Savage called Handsman and told her the money had been received.

42.     Victim 6's wife told your affiant that Marnie Handsman described a supposed raw emerald investment to her and encouraged the Victim 6s to invest money with her husband, Savage.

43.     After his investment with Savage, it became increasingly difficult to get in touch with Savage. On one occasion after they invested, when Savage was visiting at their home, Victim 6 found Savage in his upstairs office. Later, Victim 6 discovered that his bank statement and the canceled checks specifically relating to his investment with Savage were missing.

44.     Victim 6 and his wife filed suit against Mario Racanelli and Margaret Handsman Racanelli in state court in Florida, in April, 2000. The suit alleges that Savage defrauded Victim 6s and Victim 7 by inducing them to invest $ 280,000 in a supposed plan to purchase emeralds in the winter of 1999-2000. The suit claims that the "investment" was a scam, that there were never any emeralds and that Savage never returned any of their money. The suit charges that Margaret Handsman was a party to the false representations. The case is still pending.

### Bank of America (formerly NationsBank) Records

45.     Your affiant has reviewed records of Bank of America (formerly NationsBank) regarding Mario Racanelli, Margaret Handsman and Rich Offerings, Inc. On March 6, 1996, Savage, using the name "Mario Racanelli" opened a NationsBank account, N⁰ 653172817. (The "Racanelli" NationsBank account.)

46. From January 1, 1997 through January 31, 2000, at least $ 4,117,000 was deposited into the "Racanelli" NationsBank account, of which deposits consisting of checks and wire transfers totaling $ 2,843,000 are directly traceable to Victim 1. NationsBank records further show that Margaret N. Handsman had two active NationsBank personal checking accounts, № 325 934 1487 and № 0034 3066 5656, between June 13, 1997, and January 20, 2000. In that time period, at least $ 435,000 was deposited into Handsman's personal accounts which came from the "Racanelli" account. On October 23, 1998, Marnie Handsman opened another NationsBank account, № 0036 6237 7615, in the name Rich Offerings, Inc., of which she was supposedly the President/Secretary. The account was closed on or around January 18, 2000. Between October 23, 1998, and January 18, 2000, over $ 239,000 was deposited into the Rich Offerings account. Deposits included $ 82,500 from the "Racanelli" NationsBank account.

47. A number of the larger expenditures paid from the NationsBank bank accounts to which Savage had access between January 1, 1997, and February 4, 2000, have been reviewed and plainly show the expenditure of money taken by fraud to support a lavish style of living. Among the larger total expenditures noted were the following:

| | |
|---|---|
| $ 332,152.31 | American Express |
| $ 40,086 | D.M. Diamonds |
| $ 48,000 | Govbergs (jewelry) |
| $ 18,000 | Hal Martin Time Pieces |
| $ 132,600 | Hour Glass Trading |
| $ 62,000 | Luminaire (furnishings) |
| $ 414,802.18 | Mark Pierce/MSP (contractor) |
| $ 235,707.93 | Neiman Marcus |
| $ 32,150 | Pritchard Music/Pritchard Pianos |
| $ 35,686.92 | Saks/Saks Fifth Avenue |
| $ 31,135.50 | Sarasota Ford |
| $ 99,600 | Sounds Terrific/Sounds Terrific Inc. |
| $ 99,890 | Chase Automotive/ Chase Automotive Finance/Chase Manhattan |
| $ 85,455 | D.M. Diamonds |
| $ 23,035.75 | Hearts on Fire |
| $ 55,646 | Hour Glass Trading |
| $ 16,335 | Ultra Cart (memo: Hummer Golf Cart) |

48. Victim 6 reported that Savage drove a silver Millennium Edition Bentley. I have reviewed documents from a number of banks and finance companies and verified that Savage and his wife owned a 1999 Bentley and a 2000 Bentley, Millennium Edition. They have also owned: a 1998 Mercedes S600 C, a 1999 Mercedes SL600 R, and leased a 1999 Mercedes S600 V and a 1999 Mercedes ML 430 SUV (the sport utility Mercedes).

**Expenditure of funds on the Pine Needle Road Residence of Savage and Handsman**

49. A warranty deed recorded on February 16, 1999, in Sarasota County, Florida, lists Margaret N. Handsman as the purchaser of the property which is commonly designated as 7309 Pine Needle Road, Sarasota, Florida. The SunTrust loan package for that property shows that the February 26, 1999 purchase price of the property as $594,000. After the purchase, extensive remodeling was completed, to include: landscaping and irrigation, custom iron fencing with remote control security gate, the addition of a three-car garage and office/guest quarters area, travertine, wood and marble floors throughout the interior, a six figure master bath, walk-in wine cooler and a central music system. It was reported that the entire remodeling job would total over $1,000,000. Some of the allowance reportedly include $250,000 for the security system, $150,000 for the landscaping, $25,000 for the iron fence and gate, $200,000 for the custom built-ins, $50,000 for the pool/spa remodeling, $9,000 for the sink in the office/guest area and $35,000 for a custom designed mailbox. On December 2, 1999, a Mortgage ("Security Instrument") was recorded in Sarasota County, Florida showing that Margaret N. Handsman, an unmarried woman, mortgaged the property at 7309 Pine Needle Road, Sarasota, Florida. The Mortgage, dated November 24, 1999, shows SunTrust Bank, Gulf Coast as the lender of $818,000 to Handsman. According to a Satisfaction of Mortgage document, filed April 24, 2000, in Sarasota County, this mortgage was satisfied on April 19, 2000.

50. My review of Savage's finances does not reveal a legitimate source of income to support this lifestyle and I have learned that Savage had little apparent financial resources before meeting Victim 1. According to Victim 3, Savage was sharing an apartment with a roommate in 1995. When he first married Handsman, Savage and Handsman lived in an apartment above his new in-laws' garage. According to Victim 4, in the fall of 1996 Savage and Handsman lived in the Woods Apartments, in Winston-Salem. Victim 3 advised your affiant that because Savage was unable to make payments on the credit cards she obtained for him, she eventually agreed to pay the first couple of months bills on those cards. (See page 6, above). Savage has filed no federal income tax returns since at least the 1996 tax year nor declared any income.

### Specific Wire Fraud and Money Laundering Transactions

51. Having interviewed Victim 1 at great length, and having reviewed the telephone records of Victim 1 and Savage, and comparing information contained therein with banking records of Victim 1 and Savage (the "Racanelli" NationsBank Account), there is probable cause to believe that Savage was involved in a scheme to defraud that extended from early 1996, through the present, and that interstate wire communication facilities were used as a part of that scheme. Specifically, between October 14, 1998, through October 16, 1998, Savage called Victim 1 on the telephone, using interstate communication facilities, from Florida and Georgia, more than ten times and according to Victim 1 requested that she invest more money in his alleged businesses. As a result of these calls, Victim 1 deposited in excess of $35,000 into the "Racanelli" NationsBank Account. On October 22, 1998, Savage engaged in a monetary transaction in property of a value greater than $10,000, derived from specified unlawful activity, by causing check number 3040, drawn on his "Racanelli" checking account to be presented to NationsBank. Check number 3040, dated October

19, 1998, was made payable to First USA Visa in the amount of $ 15,000. Victim 1's money was in the "Racanelli" account when check number 3040 cleared NationsBank.

## Other Alias

52.	According to a June 6, 2000, affidavit of one Earl H. Mincemoyer in my possession, on or about May 19, 1997, Mincemoyer, leased a condominium at 216 Mill Pond Road, Roswell, Georgia, for the period May 19, 1997, through December 19, 1997, to a "M. John Delano and Margaret Handsman Delano." The actual lease shows "Marnie Handsman" as the lessee. M. John Delano supposedly was the owner of a pager company. The lease lists the occupants as Marnie Handsman, M. John Delano and Selana Handsman Delano. I believe that the individuals leasing the Georgia condominium in 1997 were Savage, using yet another alias, and Marnie Handsman, of Winston-Salem. Selena is the name of their daughter.

53.	According to Wachovia Auto Leasing Company documents, on June 10, 1996, Savage, in the "Racanelli" name, and Handsman leased a 1997 Ford truck. Wachovia representatives repossessed the vehicle on March 14, 1997, upon ascertaining that Savage had given a false name and social security number on his lease application. When interviewed by bank investigators about the matter, Savage claimed that the social security number had been given to him by his mother when he was about eighteen.

## Additional Background

54.	In addition to the business ventures mentioned previously, Savage also told Victim 1 that he was involved in dangerous dealings which required him to carry a gun. On one occasion, Savage told Victim 1 that his father had asked him to kill someone. Savage told Victim 1 that he was born in Italy and also that he had burned his ex-wife's car in Florida. On another occasion, he told Victim 1 he was associated with loan sharks and asked Victim 1 to loan him money to repay the supposed loan sharks.

55.	After Victim 6 invested in Savage's emerald venture, Savage tried to persuade him to engage in unlawful activity. Savage told Victim 6 that the majority of his, Savage's, money came from loansharking. Victim 6 said that Savage wanted everyone to believe that he was 'highly connected,' meaning with organized crime. Victim 6 recalled a telephone conversation, in his presence, between Savage and someone who Savage said was in New York. Victim 6 heard Savage speaking with a heavy Italian accent and heard him say, "You guys go get the money, I shouldn't have to baby-sit you." On one occasion, Savage told Victim 6 that he knew two Russians in Washington, D.C., who had diplomatic immunity and who would do anything for $ 50,000. Savage described them as 'bounty hunters' and said they could 'make people disappear.'

56.	On the tapes containing Savage's Fall, 1999, conversations with Victim 1, Savage claimed to be involved in illegal activities with dangerous individuals, of having been shot, and

declaring his intentions to leave the country as a result of these financial difficulties.

57. According to Victim 6, Savage once told him that he had safe deposit boxes all over and also had offshore trusts. Savage once told him, "I have enough money that if I had to disappear, I could leave the country and take your family with me."

58. On March 24, 2000, Sarasota County Sheriff's Deputies attempted to arrest James Anthony Savage, a/k/a Mario Racanelli, at 7309 Pine Needle Road, Sarasota, Florida, based on an Ohio fugitive warrant, for theft, receiving stolen property, forgery and misuse of a credit card. Before going to the address, a call was made to the residence. A male answered the call but refused to answer the question as to whether this was the residence of 7309 Pine Needle Road. Instead, the male put a female on the line, who confirmed the residence and identified herself as "Margaret Handsman." She was asked to go to the front gate of her residence so the deputies could speak with her. Although she agreed to do so, she did not appear outside the residence.

59. The deputies had to cut a chain securing the front gate and Margaret Handsman, after being shown the warrant, allowed the deputies into the residence. Handsman was asked if James Anthony Savage was present and answered "yes" then corrected herself immediately and said "no." Upon being asked again, she responded, "Well, I'm not sure." After approximately two and one-half hours of searching, a deputy noticed a path worn in the carpet leading underneath a large bookshelf located on the second floor. The deputy attempted to pull the bookshelf away from the wall and then felt the bookshelf being pulled back into place against the wall. Later, several deputies were able to pull the bookshelf away from the wall and found Savage behind the bookshelf standing in an unfinished room equipped with surveillance equipment, including two monitors with the capability of surveilling the interior and exterior of the home. Before the deputies left, Handsman commented that she was married to Savage, a/k/a Racanelli, and had been so for more than four years.

## Conclusion

60. Based upon the information contained in this Affidavit, I believe there is probable cause to believe that beginning in 1996, and continuing to the present, James Anthony Savage, also known as Mario Racanelli and Egisto Grandoni, and others have been involved in operating a series of fraudulent schemes by inducing investors to put money into fictional communication, waste disposal and precious gem businesses. Instead, Savage and Handsman and others have used the moneys invested to support their lavish lifestyle. I believe that the interstate wire facilities have been utilized to perpetrate their illegal activities (in violation of Title 18, United States Code, Section 1343) and that Savage and others have used bank accounts at Bank of America, SunTrust Mortgage, and other banks, to engage in monetary transactions in criminally derived property of more than $10,000, which property was derived from specified unlawful activity, namely mail and wire fraud, in violation of Title 18, United States Code, Sections 1957.

Further, Affiant sayeth not.

*Merri Lynne Conrad*
Merri Lynne Conrad, Special Agent
Internal Revenue Service

SWORN TO AND SUBSCRIBED before
me this the 4th day of January, 2001.

*RAE*
Russell A. Eliason,
United States Magistrate Judge
Middle District of North Carolina