# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF NORTH CAROLINA

FILED
OCT - 2 2001
IN THIS OFFICE
Clerk, U. S. District Court
Greensboro, N. C.
By ................

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

A 2001 Mercedes BTM
VIN WDBPJ78J41A016861
containing $3,300 in U.S. currency, a men's Rolex watch,
a Mont Blanc pen and a men's ring

## SEIZURE WARRANT

CASE NUMBER: *1:01/m/94*

TO: Any United States Marshal and any authorized officer of the United States

Affidavit having been made before me by Special Agent Merri Lynne Conrad, who has reason to believe that the property known as

a 2001 Mercedes BTM, VIN WDBPJ78J41A016861, bearing California license number 4SOG347
registered to Kisis Group LLC, or Max Marrache, 1132 Plaza Boulevard, 203, National City,
California containing $3,300 in U.S. currency, a men's Rolex watch, a Mont Blanc pen and a men's
ring.

I am satisfied that the affidavit and any recorded testimony establish probable cause to believe that the property
so described is subject to seizure and forfeiture and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to seize on or before _____9/3/01_____ (not to exceed 10 days)
the property specified, serving this warrant and making the seizure (in the daytime--6:00 a.m. to 10:00 p.m.)(at
any time in the day or night as I find reasonable cause has been established), leaving a copy of this warrant and
receipt for the property seized, and prepare a written inventory of the property seized and promptly return this
warrant to Russell A. Eliason, United States Magistrate Judge as required by law.

8/24/01   2:27 A.M.
Date and Time Issued

at   Winston-Salem, North Carolina
City and State

RUSSELL A. ELIASON
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

AO 93 (Rev. 5/85) Seizure Warrant

| **RETURN** | | *1101m194* |
|---|---|---|

| DATE WARRANT RECEIVED<br>*august 24, 2001* | DATE AND TIME WARRANT EXECUTED<br>*august 24, 2001* | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT ~~WITH~~<br>*at Apt. 301, 424 S. Holt Ave, Los Angeles, CA* |
|---|---|---|

INVENTORY MADE IN PRESENCE OF
*Special Agent Michael Morris, IRS-CI*

INVENTORY OF PROPERTY TAKEN PURSUANT TO THE WARRANT

*2001 Mercedes BTM VIN WDBPJ78J41A016861*
*Men's Rolex Watch:*
*Men's Ring (Silver Colored)*
*Mont Blanc Ball Point Pen*

*$3,300 U.S. Currency*

## CERTIFICATION

I swear that this inventory is a true and detailed account of the ~~person or~~ property taken by ~~me~~ on the warrant.
*Special Agent Michael Morris*

*Merv L. Conrad*

Subscribed, sworn to, and returned before me this date.

_____  *October 1, 2001*
U.S. Judge or Magistrate Judge    Date

Case 1:01-cr-00362-TDS   Document 12   Filed 10/02/01   Page 2 of 33

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF NORTH CAROLINA

FILED

OCT - 2 2001

IN THIS OFFICE
Clerk, U. S. District Court
Greensboro, N. C.
By ..................

**In the Matter of the Seizure of**
(Address or brief description of property or premises to be seized)

A 2001 Mercedes BTM, VIN WDBPJ78J41A016861
containing $3,300 in U.S. currency, a men's Rolex watch,
a Mont Blanc pen and a men's ring

## APPLICATION AND AFFIDAVIT
## FOR SEIZURE WARRANT

**CASE NUMBER:** *1:01 m 194*

I, Merri Lynne Conrad, being duly sworn, depose and say:

I am a Special Agent, Internal Revenue Service, Criminal Investigation, and have reason to believe that in

the Central District of California there is now certain property which is subject to forfeiture to the United States,

namely

a 2001 Mercedes BTM, VIN WDBPJ78J41A016861, bearing California license number 4SOG347
registered to Kisis Group LLC, or Max Marrache, 1132 Plaza Boulevard, 203, National City,
California containing $3,300 in U.S. currency, a men's Rolex watch, a Mont Blanc pen and a men's
ring.

which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Sections 1341,

1343, 2314, 1956, and/or 1957 and are therefore subject to seizure and forfeiture pursuant to Title 18, United

States Code, Section 981. The facts to support a finding of probable cause are as follows:

### SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:　　　☒ Yes　☐ No

_Merri Lynne Conrad_
Signature of Affiant

Sworn to before me and subscribed in my presence,

_8-24-01_
**Date**

at

**Winston-Salem, North Carolina**
**City and State**

**RUSSELL A. ELIASON**
**United States Magistrate Judge**
Name & Title of Judicial Officer

_Russell A. Eliason_
Signature of Judicial Officer

## AFFIDAVIT

Merri L. Conrad, Special Agent with Criminal Investigation (CI) of the Internal Revenue Service, (IRS), United States Treasury Department, first being duly sworn, deposes, and says:

## Introduction

1.     I am a "federal law enforcement officer" within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure.

2.     I am a Special Agent with Internal Revenue Service (IRS) Criminal Investigation (CI), United States Treasury Department, and have been so employed since July 1992. Before then, I was employed as a Revenue Officer of the Internal Revenue Service, Collection Division, for approximately one and one-half years. In connection with both positions, I have received training in Financial Investigative Techniques.

3.     My duties include investigations of alleged criminal violations relating to Financial Transaction Money Laundering (Title 18, United States Code, Sections 1956 and 1957), the Bank Secrecy Act (Title 31, United States Code, Sections 5313 and 5324), the Internal Revenue Code (Title 26, United States Code) and related offenses. As a Special Agent, I have conducted or participated in numerous investigations of alleged criminal violations of these statutes.

4.     I make this application for a warrant for seizure of the following property:

A.     a 2001 Lexus LX470, VIN JTJHT00W013502454, registered in the name DiStar Inv. LLC, 1132 Plaza Boulevard, 203, National City, California, and bearing California license 4RDN485;

B.     a 2001 Mercedes BTM, VIN WDBPJ78J41A016861, bearing California license number 4SOG347 registered to Kisis Group LLC, or Max Marrache, 1132 Plaza Boulevard, 203, National City, California, containing $3,300 in U.S. currency, a man's Rolex watch, a Mont Blanc pen and a man's ring; and

C.     furnishings, electronic equipment, jewelry, and all other personal property located in an apartment, Penthouse Number 1, also known as apartment #301, Atrium Apartment Building, 424 South Holt Avenue, Los Angeles, California 90048.

There is probable cause to believe this property is owned by James Anthony Savage, also known as Max Henry Marrache, Mario J. Racanelli, John Racanelli, Mark Racanelli, M. John Delano, Grandoni Egistot, Egisto Grandoni, Greg Eric Masonotti and Robert Toliano, and that it constitutes or is derived from proceeds traceable to an offense constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), or a conspiracy to commit such offense, including violations of Title 18 U.S.C. §§ 1341, 1343 (mail and wire fraud), 2314 (interstate transportation of money taken by fraud) and/or 1956(h) and 1957 (money laundering), and is therefore subject to seizure and forfeiture pursuant to 18 U.S.C. § 981.

5. On February 9, 2001, I filed a Affidavit containing some ninety-two paragraphs detailing the facts then known concerning the investigation of James Anthony Savage, who goes by many aliases, including Max Henry Marrache, Mario J. Racanelli, John Racanelli, Mark Racanelli, M. John Delano, Grandoni Egistot, Egisto Grandoni, Greg Eric Masonotti and Robert Toliano, in connection with an Application to obtain a Seizure Warrant for property in storage at storage unit 972 located at Storage USA, 4173 Clark Road, Sarasota, Florida. That warrant was signed by the Honorable Russell A. Eliason, Magistrate Judge for the Middle District of North Carolina, on February 9, 2001, Seizure Warrant, MDNC #1:01M137. A copy of that Affidavit is attached hereto as Exhibit 1, and your Affiant asks that it be considered incorporated herein and that its contents be weighed in determining whether this Application for a seizure warrant should be allowed. An Arrest for Savage was earlier issued in this district.

6. On Wednesday, February 14, 2001, IRS Special Agents Ted Warren and Merri Lynne Conrad executed that seizure warrant. An inventory of the contents seized from that unit included a customized wolf mailbox and two sub-zero refrigerators.

7. Since the filing of the earlier Affidavit, attached as Exhibit 1, this investigation has continued. Three additional female victims of Savage's jewelry precious gem investment scheme, as described in that Affidavit, Page 10, ¶ 41, have been identified These victims invested money at least $ 2,150,000 in Savage's scheme between January 31, 2000, and January 22, 2001.

8. On March 28, 2001, Sharon Taft, of Philadelphia, Pennsylvania, told your affiant during an interview that she and another woman met Savage, whom she knew as "Mario Racanelli," in September 1999. Later, Taft and Savage became involved in a romantic relationship, which continued until shortly before my interview with her. Taft said that she last saw Savage in California, where she had traveled for unrelated personal reasons in February 2001. When Taft left California in late February or early March 2001, she met Savage in San Diego, where Savage had a limousine take them to the airport for her return flight to Philadelphia.

9. On July 25, 2001, a confidential source (hereinafter referred to as CS) stated that she met Savage, whom she knew as "Mario Racanelli," in New York City, about the second week of January 2001. The two began a romantic relationship. On March 27, 2001, at Savage's request, CS flew to San Diego, California, and from San Diego traveled to a small town south of Tijuana, Mexico, where she met Savage. CS stated that Savage took her to a condominium complex south of Tijuana, where it appeared that he had been living. Savage was driving the larger model Lexus sport utility vehicle, dark gray metallic in color, with chrome wheels. CS observed that the late model Lexus SUV had California license plates, as did many of the vehicles at the condominium complex. After spending a couple of nights at the condominium, CS and Savage traveled to Cabo San Lucas, Mexico, before CS flew back to the United States on April 10, 2001. CS stated that when she and Savage left the condominium, Savage appeared to be taking all of his personal belongings, as if he did not plan to return. CS also said that Savage was very private with his green Louis Vuitton shoulder bag, which contained currency and a passport. He also was very private about his cellular telephone usage, not allowing her to be present during his phone conversations.

- 2 -

Savage did not permit her to be alone with his luggage nor allow her to accompany him into the motels and resort until after he had registered.

10.     On August 14, 2001, United States Deputy Marshal Jeff Tyler spoke with Torrey Becker, an employee of Bob Baker Lexus in El Cajon, California, who advised Deputy Tyler that he believed that the person in the photograph of James Savage, shown by Deputy Tyler, was an individual Becker knew as "Max Marrache." Marrache told Becker that he was the owner of the Ritz Carlton on West Beverly, in Los Angeles. Becker recalled Marrache having a 2001 Lexus LX 470, bearing California license plate number 4RDN485. Becker mailed a package to Marrache at 1401 South Oak Knoll Avenue, Pasadena, California. (According to Internet research, this is the address of the Ritz Carlton Hotel.) Becker had also contacted Marrache at telephone number, (310) 403-1922, which Marrache provided.

11.     California Division of Motor Vehicle records indicate that California license plate number 4RDN485 is assigned to a 2001 Lexus SW, VIN JTJHT00W013502454, with the registered owner listed as DiStar Inv. LLC, 1132 Plaza Boulevard, 203, National City, California. (In December 2000 and January 2001, Savage had a victim wire money offshore on two occasions to the account of DiStar Investments.)

12.     Records and information, obtained from Sprint Spectrum L.P. via court order for cellular number (310) 403-1922, indicate that the subscriber had this number changed to (310) 428-1429 in July 2001. Max Henry Marrache, of 1132 Plaza Boulevard, Suite 203, National City, California, is listed as the subscriber of (310) 428-1429.

### Savage's Arrest of August 23, 2001

13.     Deputies with the United States Marshals Service executed the federal arrest warrant for James Anthony Savage on August 23, 2001, shortly before noon (Pacific Time). Savage was arrested as he returned to his apartment complex, known as "The Atrium," located at 424 South Holt Avenue, in Los Angeles, California. At the time of his arrest, Savage was operating a 2001 Mercedes BTM, VIN WDBPJ78J41A016861, bearing California license number 4SOG347 registered to Kisis Group LLC, or Max Marrache, 1132 Plaza Boulevard, 203, National City, California. Also located in the vehicle was $3,300 in United States currency, a man's Rolex watch, a Mont Blanc pen and a man's ring. Deputies also seized from Savage's person identification documents in the names Max Marrache (a Canadian photo identification) and Mario Racanelli (Visa credit card).

14.     According to a conversation with Asaf Mordoch, the building manager for the Atrium Apartment Building, 424 South Holt Avenue, Los Angeles, California 90048, Penthouse Nº 1, also known as apartment # 301), was leased to Max Marrache two months ago and he moved in effective July 1, 2001. Mordoch identified a photograph of James Savage as the individual he knew as Max Marrache. The lease was for a year. The apartment was unfurnished except for basic appliances. A furniture store named "Diva," which is located in Los Angeles at the corner of Beverly &

- 3 -

Robinson, has delivered a significant amount of furniture to Penthouse Nº 1 since Savage moved in. Savage had an elaborate alarm system installed since moving in and the building owner had never entered the apartment without Savage.

15. Upon approaching the apartment, Deputies were approached by a white female who turned out to be Sharon Taft, a known associate of Savage (See ¶ 8, above). Taft said that she was a guest of Savage, staying at Apartment #301 at that location. Taft said that she had recently traveled to California from Philadelphia, Pennsylvania, for the purpose of visiting Savage. Taft told the law enforcement officers that the apartment was completely furnished and that Savage had "set it up like his other places." Taft also told law enforcement that Savage had given her a diamond-encrusted watch to wear out to dinner but repossessed it and she believed that he kept it in Apartment #301.

## Conclusion

16. In short, there is probable cause to believe that beginning in 1996, and continuing to the present, James Anthony Savage, also known as Max Henry Marrache, Mario J. Racanelli, John Racanelli, Mark Racanelli, M. John Delano, Grandoni Egistot, Egisto Grandoni, Greg Eric Masonotti and Robert Toliano, and others have been involved in operating a series of fraudulent schemes by inducing investors to put money into fictional communication, waste disposal and jewelry-oriented businesses. Instead, Savage and Handsman have used the monies invested to support their lavish lifestyle. I believe that the interstate mail and wire facilities have been utilized to perpetrate their illegal activities, in violation of Title 18, United States Code, Sections 1341 and 1343, and that Savage and others have used bank accounts at Bank of America, SunTrust Mortgage, and other banks, to engage in monetary transactions in criminally derived property of more than $10,000, which property was derived from specified unlawful activity, namely mail and wire fraud, in violation of Title 18, United States Code, Section 1957.

17. Further, there is probable cause to believe that Savage has continued to derive his sole means of living from his investment schemes. During the years of his life that I have investigated with respect to his fraud schemes, from about 1995 to the present, there has been little evidence that he has earned an honest livelihood. I believe that all money used for his daily expenses, as well as his vehicles and luxury purchases, constitutes the proceeds of his schemes.

18. Based on the information contained in this Affidavit, and the original Affidavit filed by your Affiant on February 9, 2001, (Exhibit 1), there is probable cause to believe that the following property is owned by James Anthony Savage, also known as Max Henry Marrache, Mario J. Racanelli, John Racanelli, Mark Racanelli, M. John Delano, Grandoni Egistot, Egisto Grandoni, Greg Eric Masonotti and Robert Toliano, and constitutes or is derived from proceeds traceable to an offense constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), or a conspiracy to commit such offense, including violations of Title 18 U.S.C. §§ 1341, 1343 (mail and wire fraud), 2314 (interstate transportation of money taken by fraud) and/or 1956(h) and 1957 (money laundering), and is therefore subject to seizure and forfeiture pursuant to 18 U.S.C. § 981:

- 4 -

A.    a 2001 Lexus LX470, VIN JTJHT00W013502454, registered in the name DiStar Inv. LLC, 1132 Plaza Boulevard, 203, National City, California, and bearing California license 4RDN485;

B.    a 2001 Mercedes BTM, VIN WDBPJ78J41A016861, bearing California license number 4SOG347 registered to Kisis Group LLC, or Max Marrache, 1132 Plaza Boulevard, 203, National City, California, containing \$3,300 in U.S. currency, a man's Rolex watch, a Mont Blanc pen and a man's ring; and

C.    furnishings, electronic equipment, jewelry and all other personal property located in an apartment, Penthouse Number 1, also known as apartment #301, Atrium Apartment Building, 424 South Holt Avenue, Los Angeles, California 90048.

Further, Affiant sayeth not.

Merri Lynne Conrad

Merri Lynne Conrad, Special Agent
Internal Revenue Service

SWORN TO AND SUBSCRIBED before
me this the *24th* day of August, 2001.

Russell A. Eliason,
United States Magistrate Judge
Middle District of North Carolina

- 5 -

*Exhibit 1*

AO 106 (Rev. 7/87) Affidavit for Seizure Warrant

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF NORTH CAROLINA

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

Contents of storage unit 972 located at Storage USA, 4173 Clark Road, Sarasota, Florida.

**APPLICATION AND AFFIDAVIT FOR SEIZURE WARRANT**

CASE NUMBER: *1:01 / m / 37*

I, Merri Lynne Conrad, being duly sworn, depose and say:

I am a Special Agent, Internal Revenue Service, Criminal Investigation Division, and have reason to believe that in the Middle District of Florida there is now certain property which is subject to forfeiture to the United States, namely

refrigerators, a custom-designed mailbox, and other personal property

which constitute or are derived from proceeds traceable to violations of Title 18, United States Code, Sections 1341, 1343, 2314, 1956, and/or 1957 and are therefore subject to seizure and forfeiture pursuant to Title 18, United States Code, Section 981. The facts to support a finding of probable cause are as follows:

### SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

*Merri Lynne Conrad*
Signature of Affiant

Sworn to before me and subscribed in my presence,

FEB 0 9 2001
_____
Date

at

Winston-Salem, North Carolina
City and State

RUSSELL A. ELIASON
United States Magistrate Judge
Name & Title of Judicial Officer

*Russell A. Eliason*
Signature of Judicial Officer

**AFFIDAVIT**

Merri L. Conrad, Special Agent with the Internal Revenue Service (IRS) Criminal Investigation Division (CID), United States Treasury Department, first being duly sworn, deposes, and says:

**Introduction**

1.      I am a "federal law enforcement officer" within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure.

2.      I am a Special Agent with the Internal Revenue Service (IRS) Criminal Investigation Division (CID), United States Treasury Department, and have been so employed since July 1992. Before then, I was employed as a Revenue Officer of the Internal Revenue Service, Collection Division, for approximately one and one-half years. In connection with both positions, I have received training in Financial Investigative Techniques.

3.      My duties include investigations of alleged criminal violations relating to Financial Transaction Money Laundering (Title 18, United States Code, Sections 1956 and 1957), the Bank Secrecy Act (Title 31, United States Code, Sections 5313 and 5324), the Internal Revenue Code (Title 26, United States Code) and related offenses. As a Special Agent, I have conducted or participated in numerous investigations of alleged criminal violations of these statutes.

4.      I make this application for a warrant for seizure of the contents of a storage unit located at Storage USA, 4173 Clark Road, Sarasota, Florida, and designated unit 972, which unit was rented in the name Tommy Vayias. On information and belief, the unit contains property including two refrigerators and a custom designed mailbox. There is probable cause to believe this property is owned by James Anthony Savage, also known as Mario J. Racanelli, John Racanelli, Mark Racanelli, M. John Delano, Grandoni Egistot, Egisto Grandoni, Greg Eric Masonotti and Robert Toliano, and his wife Margaret "Marnie" Racanelli, a/k/a Margaret Nathalie Handsman, and that it constitutes or is derived from proceeds traceable to an offense constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), or a conspiracy to commit such offense, including violations of Title 18 U.S.C. §§ 1341, 1343 (mail and wire fraud), 2314 (interstate transportation of money taken by fraud) and/or 1956(h) and 1957 (money laundering), and is therefore subject to seizure and forfeiture pursuant to 18 U.S.C. § 981.

## Scheme to Defraud Victim 1

5.        All of the victims to the alleged fraud committed by Savage will be referred to anonymously, so as to protect their identities at this stage in the investigation. In August, 1999, a North Carolina resident, whom I will herein refer to as Victim 1, filed a complaint with her local police department. In a number of interviews conducted between August 25, 1999, and November 12, 1999, with law enforcement personnel, including your affiant, Victim 1 gave detailed information about various activities in which Savage had been engaged, and provided financial records and other documents concerning her believed investments with Savage. At the time, Victim 1 knew Savage as "Mario J. Racanelli." Victim 1 provided the following information, much of which has been corroborated by law enforcement officers.

6.        In November, 1996, Savage made a "cold call" to Victim 1 to inquire about ballroom dance lessons. Victim 1 was in her late sixties, Savage is now thirty-two. (Victim 1 states that he told her he was in his late thirties.) According to Victim 1, they developed a friendship and, later, a romantic relationship. Savage told Victim 1 that he had worked in the communications business and wanted to open his own communications store. He told Victim 1 he wanted to open the store as a joint venture. Savage and Victim 1 looked at a number of locations which Savage discussed as being potential business locations. In January, 1997, Savage asked Victim 1 to invest $3,000 which would be applied toward the purchase of fixtures for his purported store. Victim 1 provided him the money.

7.        Over the next two and one-half years, Savage repeatedly requested that Victim 1 provide additional money as investments in supposed businesses which he claimed to be operating. Over the course of those years, Victim 1 invested well over $4,500,000 with Savage in his alleged business ventures.

8.        Savage gave various explanations to Victim 1 over the course of time when he was needing her to invest in his business endeavors. Savage said that he needed the money to open, operate, purchase business equipment for, or to hire and pay workers, and various other work-related expenses, for his supposed business ventures.[1] Savage always promised that Victim 1 would earn handsome profits from these investments. Victim 1 reports that she repeatedly told him that she merely wanted to recoup her investment and the interest or dividends it would have earned had she left the money in the bank. Savage assured her that she would receive that and more.

9.        As noted, at first Savage said he was in the communications business. At some point, he told Victim 1 that he had agreed to help out a Russian friend who was also in the communications business. Eventually, Savage informed Victim 1 that, in fact, he had fled from Tennessee, where he and his assistants had been working, because what they were doing there was illegal. He explained to Victim 1 that they had been disposing of nuclear waste which had been brought to their location in tank trucks. Savage said that the government had facilities for the nuclear waste to be dumped but was paying Savage under the table for his supposed services. A portion of the money Victim 1 invested with Savage was supposedly used to purchase equipment needed in this illegal

---

[1] As set forth below beginning at Page 6, Savage had used a similar *modus operandi* to obtain monies from other victims. The amounts he had secured from each of the earlier victims was significantly smaller.

dumping business. In the weeks just before my first interview with Victim 1, Savage again contacted her seeking additional funds to replace some equipment that had supposedly been stolen and to pay his and his assistants' travel expenses.

10.     Savage repeatedly told Victim 1 that she would make profits from her investments, that he would repay her all her money with interest, and that he would pay the taxes on the capital gains she incurred as she was taking her money out of her trust fund investments to give to him. Victim 1 invested the money with Savage to help him establish his own business. From his earnings from his businesses, Savage promised to repay Victim 1 the money she invested. In the final year, Savage continued to request funds, assuring Victim 1 that if only she were to make an additional investment the project could be completed and that he would then earn some fifteen to twenty-two million dollars. In the later stages, Victim 1 feared that if she did not give Savage the additional money he claimed he needed in order to complete the supposed project, she would lose all of the money that she had already invested. Victim 1 possessed little documentation about the character of her investments, for whenever she spoke with Savage about putting things in writing he assured her that it would not be necessary and that she could trust him to take care of her. On numerous occasions Savage asked Victim 1 to marry him.

11.     Victim 1 made her investments by personal check, official bank check, wire transfer and currency. The money Victim 1 invested with Savage was delivered in varying ways over the years. On some occasions, she handed it directly to Savage. On other occasions, Victim 1 deposited it into an account Savage had in the name "Racanelli" at NationsBank (now Bank of America). There were times when he asked that she send the money via Federal Express. Funds sent via Federal Express were sent to hotels in several states including Georgia, Florida, Illinois, New York, Washington, Utah and Texas. These funds were almost always in the form of currency. Victim 1 stated that she was never physically at a business site supposedly owned by Savage nor in his residence, wherever that might be. The investigation has failed to identify any business, communication or otherwise, operated by Savage.

## Documentary Evidence Related to Victim 1

12.     Victim 1 has provided bank, credit card, FedEx receipts, and other records to substantiate the amount and method(s) of her transfer of funds to Savage. Victim 1's BB&T and Southern Community Bank and Trust checking account records show that Victim 1 wrote checks totaling over $2,400,000 payable to "Mario Racanelli" during the time period January 8, 1997, through August 6, 1999. She stated she deposited the majority of these checks directly into Savage's "Racanelli" NationsBank account. During the same period, Victim 1 wrote over $1,679,000 in checks payable to "Cash". Of these, checks totaling $1,597,000 had either Savage's bank account number or his initials, "MJR," (Mario J. Racanelli), written in the memo section of each check. Of the remaining checks made out to "cash" totaling over $81,000, Victim 1 states that the majority of this currency from the checks was also turned over to Savage.

- 3 -

Case 1:01-cr-00362-TDS    Document 12    Filed 10/02/01    Page 12 of 33

13. Over the course of the same two and a half years, Victim 1's bank accounts show other withdrawals totaling over $1,390,000 which she states were further investments with Savage, given him in the form of currency or cashier's checks. I examined wire transfer records and found $384,000 was sent in various transfers from Victim 1's BB&T checking and trust accounts to the "Racanelli" NationsBank account.

14. In short, Victim 1's bank records show the withdrawal or transfer of funds totaling over $5,775,000 which corroborates her contention that she provided large sums of money to Savage. I have obtained the records of Savage's NationsBank account, in the name of "Mario Racanelli." Beginning January 1, 1997 and continuing through January 31, 2000, there were deposits into the account of approximately $4,115,000, of which over $2,840,000 was clearly provided by Victim 1, which had been deposited into the "Racanelli" account as either checks or wires transfers. Further, while sources of cash deposits are always difficult to identify, during the same period of time there were over $671,000 in cash deposits into the four NationsBank accounts to which Savage had access. (One in his name, two in the name of his wife, Margaret "Marnie" Handsman, and one in the name of Rich Offerings, Inc., a name under which Savage and Handsman claimed to do business.) My review of AmSouth Bank and NationsBank records shows that Savage has rented at least three different safe deposit boxes since October 24, 1997. Each box was rented jointly in the names Margaret Handsman and Mario Racanelli. Numerous entries were made to these safe deposit boxes, primarily by Savage. A comparison was made of the fifteen dates that Savage entered one of the boxes with the period that Victim 1 withdrew large amounts of currency from the bank (which she alleges to have personally delivered or sent via FedEx to Savage). At least eleven of these entries into the box occur in eight or fewer days following large currency withdrawals made by Victim 1. The investigation has revealed that Victim 1 and Victim 7 (discussed later in this affidavit) have provided amounts of currency to Savage approaching $3,000,000, while your affiant has been able to document currency expenditures of only $1,300,000. It is probable that Savage's various safe deposit boxes have been used to store a considerable amount of the currency Victim 1 says she has given Savage and which has not been identified in the bank accounts to which Savage had access. Upon opening one of the safe deposit boxes, Savage purportedly told bank personnel that he and Handsman were in the area on vacation and wanted to store their valuables in the box. At some point later, bank personnel advised that Savage told them that he was in the diamond and jewelry business and traveled to trade shows in Georgia and North Carolina. According to bank personnel, Savage usually came alone to enter the safe deposit box with a brief case described as being similar to those airline pilots carry. A confidential source, independent of bank personnel above, advised your affiant that he/she had observed Savage retrieve $50 to $100, in currency, from the trunk of his (Savage) vehicle, in which the informant also observed a pilot's case. This observation took place following the purchase of the Pine Needle Road residence by Handsman. On January 10, 2001, agents attempted to execute a seizure warrant for Safe Deposit Box #69, AmSouth Bank, 5950 Beneva Road, Sarasota, Florida. It was determined at that time that the box had been closed out by Savage/Racanelli or Handsman.

15. Victim 1 provided your affiant with a number of FedEx receipts. She asserted that these receipts were from packages she sent Savage which contained considerable amounts of

- 4 -

currency. The earliest FedEx airbill was dated May 5, 1997, and listed the recipient as "Mario Racanelli, Room 34A, Fairways Resort, 103 Palm River Boulevard, Naples, Florida." There were forty additional FedEx airbills with "Racanelli" as the recipient and mailed to him at hotels located in a number of states, primarily Georgia and Florida. Virtually every FedEx mailing from Victim 1 to Savage traveled interstate. I reviewed the FedEx records and travel-related records provided by Victim 1 and compared the relevant dates with the dates of numerous Currency Transaction Reports (CTRs) and bank records showing large currency withdrawals from Victim 1's accounts. The dates coincide in large part: in other words, I found large currency withdrawals which were dated the same day or just prior to the dates of many of the FedEx receipts or travel-related records.

16.　　A comparison of telephone records for Victim 1's two residential telephone numbers and for two of Savage's cellular telephone numbers show that numerous calls were made between the numbers identified for each party. The earliest call made from Savage's cellular telephone to Victim 1's residence occurred on December 24, 1996. From that date through November of 1999, Savage's cellular records show over two thousand calls to Victim 1's numbers. Records show that many of these calls were interstate in nature. This is corroborated by the fact that Savage has not been a resident of North Carolina since early 1997, based upon bank records and other documentation. During the same time, Victim 1's telephone records show that she was billed for almost three hundred calls to Savage's cellular number (910/336) 407-3426. It is believed that all of these calls were made from locations other than her residence, as any calls made from her residence to (910/336) 407-3426 would have been treated as local calls by her carrier.

17.　　Victim 1 provided to your affiant tapes of her telephonic conversations with Savage which she recorded in September, October, and November, 1999. I have reviewed transcripts of each tape. In those conversations, Savage repeatedly asked Victim 1 for additional money so as to complete some "job", implying that if she did not do so, she would lose all of the money that she had heretofore invested. These conversations corroborate Victim 1's statements to affiant concerning her investments with Savage, the amount of money involved and her expectation that the money would be repaid. Savage assured Victim 1 of his affiliation with a Russian business partner, who was supposedly worth millions, and who would pay Savage fifteen to twenty-two million dollars upon completion of the job.

18.　　In an affidavit Savage submitted in connection with a civil suit, Savage acknowledged receiving Victim 1's money and other valuable property, but termed them as gifts, freely and voluntarily tendered by Victim 1 and received by him without expectation of repayment. According to Savage, Victim 1 gave him gifts, including substantial sums of money, expensive clothing, shoes, jewelry and other personal items, and permitted him to use her credit cards, among other things, so that he would continue to maintain a meretricious sexual relationship with her, and so that he would appear to be financially successful in the eyes of Victim 1's relatives and friends.

19.　　In summary, Victim 1's allegations are that she has invested millions of dollars in various of Savage's purported business schemes — a supposed communications business and a hazardous waste business. Victim 1's allegations are that she has been the victim of a bogus

- 5 -

investment scheme involving Savage and the services of FedEx, a private or commercial interstate carrier, were used to transmit substantial sums of money constituting the proceeds of a fraudulent scheme.

## Savage Criminal History

20.     Savage's criminal history dates back to January 17, 1990, when he was arrested by Statesville, North Carolina Police Department officers for fraud and fraud-related charges. Savage pleaded guilty to a charge of obtaining property by worthless checks and was sentenced to six months jail with two years probation.

21.     Since the 1990 arrest and conviction, reflected above, Savage has been arrested six additional times on fraud-related charges, including obtaining property by false pretense, credit card fraud, and theft, by six different law enforcement agencies in Ohio, New Jersey and North Carolina. In two of those cases Savage was convicted and/or pleaded guilty and served time in jail. In an Ohio fraud case, on which Savage was ultimately arrested in his home on Pine Needle Road, Sarasota, the charges were ultimately dismissed after Savage paid in excess of $40,000 in restitution.

22.     Savage was also arrested on March 23, 1991, in Ohio, for carrying a concealed weapon and on January 26, 1993, in New York, for criminal possession of a weapon (a loaded gun).

23.     On March 8, 2000, Savage was arrested in Sunny Isles Beach, Florida, on charges of trafficking in Rohypnol (Flunitrazepam, more commonly known as the "date rape" drug) and possession of a counterfeit driver license (a Florida driver license in the name "Mario Racanelli," of 1290 N. Palm Avenue, Sarasota, Florida). When Savage was first confronted by law enforcement officers, he was standing alongside a limousine. Upon announcing their presence, Savage ignored warnings and reached into the back seat of the limo. In the back seat police later found both the drugs and an open brown bag containing $12,228 in currency. Savage told the arresting officers that his name was "Grandoni Egistot," and gave the police one Canadian photo identification in the name "Grandoni Egistot,"one Canadian photo identification in the name "Robert Toliano," and a Canadian passport in the name "Robert Toliano." A false Florida driver license was located in Savage's wallet. It was Savage's photograph in all the false identifications, in the names of Grandoni Egistot, Robert Toliano and Mario Racanelli. Sharon Taft, who identified herself as Savage's girlfriend, told police that the brown bag belonged to Savage. The charges are still pending in Florida state court.

24.     On March 9, Christopher M. Smith of 11051 130th Avenue North, Largo, Florida, an associate of Savage, paid a $20,000 cash bond, using U.S. currency, for Savage's release related to the arrest above (in the name Grandoni Egistot).

25.     On October 18, 2000, Mario Racanelli, a/k/a James Savage, was arrested in Naples, Florida, by the Collier County Sheriff's Office, for the violation of a domestic violence injunction obtained by Margaret Handsman. According to Collier County Sheriff's Office personnel, Savage's associate Tommy Vayias paid the $40,000 cash bond on October 20, 2001, in U.S. currency, for Savage's release.

- 6 -

## Prior, Simultaneous, and Subsequent Similar Fraudulent Criminal Conduct

26. During the course of this investigation, I have learned of four additional female victims from whom Savage obtained money for the purpose of some apparently fictitious business endeavors.

### Communications Business Investment Fraud with Victim 2

27. I have interviewed another woman from North Carolina, to whom I shall herein refer to as Victim 2. She told me that she met Savage, whom she knew as "Mario Racanelli," around February of 1996. Savage told Victim 2 that he wanted to either open a storefront to sell cellular phones and pagers or sell them out of his residence. Savage said that he planned to buy approximately sixty pagers at a cost of around $60 each and resell the pagers for $100 - $120 each. Savage asked Victim 2 to invest $4,000 - $5,000 in his plan to purchase pagers. He promised that he would double the investment within ninety days. In April or May, 1996, she obtained a consumer loan from Wachovia Bank for approximately $2,500 and had the cashier's check made payable to herself and Savage.

28. Savage was angry that Victim 2 had procured the money in the form of a cashier's check. He told her he wanted to deal only in cash. Approximately one month after Victim 2 gave Savage the cashier's check, Savage told her that he did not have quite enough money to complete the deal, so she invested an additional $2,200. On June 6, 1996, she obtained a cash advance on her credit card to purchase a Wachovia official check for $2,200, which Victim 2 gave to Savage. Following this time, when Victim 2 asked Savage about the pager transaction, he would just put her off by telling her that he was still working on the deal. Neither profits nor any of Victim 2's original investment were ever returned. I have reviewed bank records for Savage's "Racanelli" NationsBank account, _ 653172817, and verified the deposit of these two checks from Victim 2 into the account.

29. On March 21, 1997, Victim 2 filed a civil complaint in an effort to recover the $4,700 that she had invested with Savage. A Forsyth County deputy sheriff attempted to serve a related civil summons at Savage's residence, 1640 Woods Road, Apartment S, Winston-Salem, but was told by the woman who answered the door that he had left home and his whereabouts were unknown (Savage was living with Handsman at the time).

### Communications Business Investment Fraud with Victim 3

30. On February 11, 2000, I interviewed a woman living in North Carolina whom I shall hereinafter refer to as Victim 3. Victim 3 knew Savage before he served time in prison. In December, 1995, after he was released, he told her that he wanted to start up a communications business. Savage explained to her that he wanted to get into the pager business and stated that he knew he could make the business work if he put up a good front in order to recruit investors. He said that he was targeting investors in South Carolina.

- 7 -

31.     Savage talked Victim 3 into opening several joint credit card accounts. He explained to her that he needed the cards to make it appear to his potential investors that he was successful. He promised that he would not charge anything on the cards. Victim 3 stated that they obtained several credit cards including from Sears, American Express, Citgo, Dillards, J.C. Penney and Radio Shack. At Savage's request, the name on the joint accounts was "Mario Racanelli." Savage explained that he wanted to change his name to Racanelli because of his arrest record and to keep his past from interfering with his ability to set up the business. Savage led Victim 3 to believe that they were going to have a long-term romantic relationship.

32.     Savage asked if he could use her address for mail because he had had a problem with someone going through his mail and/or taking his money. She agreed and stated that Savage received credit card bills and cellular telephone bills at her address. I have reviewed various banking records in the course of this investigation and found that on March 5, 1996, Savage, using the name "Mario Racanelli," opened a NationsBank account, _ 653172817, in Winston-Salem, and used Victim 3's address as the address to which the monthly statements should be sent.

33.     In April of 1996, the credit card bills started arriving. At first, Victim 3 just gave the bills to Savage without opening them. At some point she became aware that Savage was not paying the bills, that the credit cards were "maxed out" and confronted him about it. He requested that she just make the minimum payment on the cards for a couple of months until he could get his business going. Savage told her that the purchases made with the cards were items for his potential business investors.

34.     Victim 3 gave Savage approximately $1,500 which was a loan payout from American General Finance. Savage told her that he needed the money to show his potential investors that he was solvent because they were apparently getting "cold feet." Victim 3 never received her loan money back, nor did Savage honor the credit card debts he incurred. As a result of the debts which Savage incurred on the credit cards and telephone in her name, Victim 3 filed for bankruptcy in December, 1996.

### Communications Business Investment Fraud With Victim 4

35.     A North Carolina resident, whom I shall herein refer to as Victim 4, reported to your affiant that she met Savage, whom she knew as "Mario Racanelli," and his wife, Marnie, in September, 1996, at the Woods Apartments in Winston-Salem, North Carolina. Thereafter, Victim 4 became romantically involved with Savage.

36.     Savage told her about an "investment opportunity" which would double her investment within ninety days. Savage told Victim 4 that his family owned and operated lucrative communications distributorships along the East Coast, from New York to Florida, making billions of dollars a year. Savage offered to let her invest in a pager/cellular telephone purchase which he was getting ready to make. He guaranteed that, even if she did not make the profit that he promised,

- 8 -

her initial investment would be secure. Savage asked Victim 4 to invest $10,000, but Victim 4 told him that she only had about $3,000 in her savings account. Savage suggested that she get a cash advance so that she could invest at least $5,000.

37.     On January 29, 1997, Victim 4 cashed in a $1,700 Certificate of Deposit and obtained a $3,000 cash advance to obtain the money, and gave a total of $5,000 in currency to Savage. Savage told her the funds for the purchase had to be in cash. He said that the company with which he was dealing needed cash and that they did not want a check. She asked Savage if there was anything illegal about the transaction. Savage assured her that there was nothing illegal involved, that it was a family-owned business.

38.     In late February/early March, 1997, Victim 4 became concerned that Savage may have "scammed" her. When she told Savage her fears, he became angry and loud. Savage warned Victim 4 that if she said any bad things in the town where he had business interests that he would have the family's attorneys take care of her. Victim 4 stated that she was very frightened of Savage by this time. She brought up the possibility of reporting Savage to the police. He responded that if she did, he would take care of her. Victim 4 believed that he was threatening to return and physically harm her.

39.     After ninety days, Savage answered her inquiry concerning when her investment would be repaid. Savage told her that he had the money and that they had made a significant profit. Savage scheduled an appointment to meet with her in early May, 1997, to return her investment (principal and proceeds) but failed to appear. Since mid-May, 1997, Victim 4 has had no further contact with Savage.

### Communications Business Investment Fraud With Victim 5

40.     Fellow law enforcement personnel active in this investigation have spoken with a lady, who is a resident of a small town in Georgia, whom I shall herein refer to as Victim 5. She met Savage, whom she knew as "Mario Racanelli," around Labor Day, 1996. He told her that he was involved in telephone communication work in Atlanta but lived in Winston-Salem, North Carolina. He told her that for $3,000 she could buy a case of pagers through him because he had an overseas contact. He offered to then resell the pagers for her, stating that she would be able to double her money in a month. Victim 5 gave him a cashier's check in the amount of $3,200. Savage promised to repay Victim 5 $5,500 on December 26, 1996. Afterwards, Savage called Victim 5 requesting more money and told her that if he did not get the money that his life would be in danger. She refused and later when she questioned Savage about the money that he owed her, Savage became angry and told her that she didn't know the contacts that he had. Victim 5 never received any of her money back. I have reviewed bank records for Savage's NationsBank account, no. 653172817, and verified the deposit of Victim 5's cashier's check, payable to "Mario Racanelli, d/b/a IMMTEL," on November 27, 1996.

- 9 -

## Jewelry Investment Fraud Scam With Victim 6 and Victim 7

41.　　In August, 2000, I spoke with a Victim 6 and his wife, both residents of Florida, who invested $205,000 with Savage, whom they knew as "Mario Racanelli." Savage told Victim 6 he was retired from the jewelry business but could still buy uncut emeralds at wholesale prices through contacts he had in the business. Victim 6 agreed to invest in a plan in which Savage would purchase raw emeralds and then have them cut and sold. Savage promised the Victim 6 a forty-percent return on their initial investment (in addition to the return of any principal). Savage promised Victim 6 that their money would not be at risk because their money would remain in his account until he had examined the emeralds and was satisfied with their quality. Victim 6 invested his money in the winter of 1999-2000. An acquaintance of Victim 6, Victim 7, invested an additional $75,000 in the same venture at approximately the same time.

42.　　Savage told Victim 6 that he earned seven million dollars a week through his stock and business dealings.

43.　　Victim 6 said that Savage's wife, Marnie, knew of his emerald investment with Savage. He heard Savage talk of the investment to Handsman. When Victim 6 gave Savage Victim 7's $75,000 (in currency, in a cardboard box), he believed that Savage called Handsman and told her the money had been received. Victim 6 stated that he had been to Savage's condominium located at Sands Pointe, in Sunny Isles, Florida on one occasion where he observed Savage open a safe. Based upon my investigation, this condominium is Unit 1703, at 16711 Collins Avenue, Sunny Isles, Florida. When the safe was opened, a plastic bag containing what Victim 6 described as hundreds of thousands of dollars slid out of the safe. Victim 6 stated that Savage had purchased two safes which he described as being three to four feet tall, from Locks Company. Savage told Victim 6 that he had one delivered to the Sunny Isles condo and another delivered to his Sanderling residence (7309 Pine Needle Road, Sarasota). Further investigation has determined that Savage has vacated both properties as of the present date.

44.　　The wife of victim 6 told your affiant that Marnie Handsman described a supposed raw emerald investment to her and encouraged both she and her husband to invest money with Savage.

45.　　After his investment with Savage, it became increasingly difficult for Victim 6 to get in touch with Savage. On one occasion after they invested, when Savage was visiting at their home, Victim 6 found Savage in his upstairs office. Later, Victim 6 discovered that his bank statement and the canceled checks specifically relating to his investment with Savage were missing. According to Victim 6, Savage once told him that he had safe deposit boxes all over and also had offshore trusts. Savage once told him, "I have enough money that if I had to disappear, I could leave the country and take your family with me."

46.　　Victim 6 and his wife filed suit against Mario Racanelli and Margaret Handsman Racanelli in Florida state court in April, 2000. The suit alleges that Savage defrauded Victim 6 and Victim 7 by inducing them to invest $280,000 in a supposed plan to purchase emeralds in the winter

- 10 -

of 1999-2000. The suit claims that the investment was a scam, that there were never any emeralds and that Savage never returned any of their money. The suit charges that Margaret Handsman Racanelli was a party to the false representations. The case is still pending.

## Bank of America (formerly NationsBank) Records

47.  Your affiant has reviewed records of Bank of America (formerly NationsBank) regarding Mario Racanelli, Margaret Handsman and Rich Offerings, Inc. On March 6, 1996, Savage, using the name "Mario Racanelli," opened a NationsBank account, no. 653172817. (The "Racanelli" NationsBank account.)

48.  From January 1, 1997 through January 31, 2000, at least $4,117,000 was deposited into the "Racanelli" NationsBank account, of which deposits consisting of checks and wire transfers totaling $2,843,000 are directly traceable to Victim 1. NationsBank records further show that Margaret N. Handsman had two active NationsBank personal checking accounts, no. 325 934 1487 and no. 0034 3066 5656, between June 13, 1997, and January 20, 2000. In that time period, at least $435,000 was deposited into Handsman's personal accounts which came from the "Racanelli" account. On October 23, 1998, Marnie Handsman opened another NationsBank account, no. 0036 6237 7615, in the name Rich Offerings, Inc., of which she was supposedly the President/Secretary. The account was closed on or about January 18, 2000. Between October 23, 1998, and January 18, 2000, over $239,000 was deposited into the Rich Offerings account. Deposits included $82,500 from the "Racanelli" NationsBank account.

49.  A number of the larger expenditures paid from the NationsBank bank accounts to which Savage had access between January 1, 1997, and February 4, 2000, have been reviewed and plainly show the expenditure of money taken by fraud to support a lavish style of living. Among the larger total expenditures noted were the following:

| | |
|---|---|
| $332,152.31 | American Express |
| 99,890 | Chase Automotive/Chase Auto. Finance/Chase Manhattan |
| 125,541 | D.M. Diamonds |
| 48,000 | Govbergs (jewelry) |
| 18,000 | Hal Martin Time Pieces |
| 23,035.75 | Hearts on Fire |
| 188,246 | Hour Glass Trading |
| 62,000 | Luminaire (furnishings) |
| 414,802.18 | Mark Pierce/MSP (contractor) |
| 235,707.93 | Neiman Marcus |
| 32,150 | Pritchard Music/Pritchard Pianos |
| 35,686.92 | Saks/Saks Fifth Avenue |
| 31,135.50 | Sarasota Ford |
| 99,600 | Sounds Terrific/Sounds Terrific Inc. |
| 16,335 | Ultra Cart (memo: Hummer Golf Cart) |

- 11 -

50.     Victim 6 reported that Savage drove a silver Millennium Edition Bentley. I have reviewed documents from a number of banks and finance companies and verified that Savage and his wife owned a 1999 Bentley and a 2000 Bentley, Millennium Edition. They have also owned: a 1998 Mercedes S600 C, a 1999 Mercedes SL600 R, and leased a 1999 Mercedes S600 V and a 1999 Mercedes ML 430 SUV (the sport utility Mercedes).

51.     Victim 6 and his wife observed Handsman wearing a large, purportedly 7 carat, yellow diamond ring and an elaborate diamond necklace. They stated that Savage was fond of expensive watches and owned both a Harry Winston watch and a diamond bezel watch, purportedly valued at approximately $900,000 and $500,000, respectively.

## Losses Attributable to Victims

52.     Virtually all of the loss in the present case is attributable to Victim 1. Victim 1's bank records show the withdrawal or transfer of funds totaling over $5,775,000 which corroborates her statements that she provided large sums of money to Savage. While the loss to Victims 6 and 7 totals approximately $280,000, their investments occurred within approximately the last fourteen months. In addition, the total loss figure attributable to Victims 2 through 5 is approximately $14,400.

## Expenditure of funds on the Pine Needle Road Residence of Savage and Handsman

53.     A warranty deed recorded on February 16, 1999, in Sarasota County, Florida, lists Margaret N. Handsman as the purchaser of the property which is commonly designated as 7309 Pine Needle Road, Sarasota, Florida. The SunTrust loan package for the property shows that the February 26, 1999 purchase price of the property was $594,000. After the purchase, extensive remodeling was completed, to include: landscaping and irrigation, custom iron fencing with remote control security gate, the addition of a three-car garage and office/guest quarters area, travertine, wood and marble floors throughout the interior, a six figure master bath, walk-in wine cooler and a central music system. It was reported that the cost of the entire remodeling job exceeded $1,000,000. Allowances reportedly included $250,000 for the security system, $150,000 for the landscaping, $25,000 for the iron fence and gate, $200,000 for the custom built-ins, $50,000 for the pool/spa remodeling, $9,000 for the sink in the office/guest area and $35,000 for a custom designed mailbox. On December 2, 1999, a Mortgage ("Security Instrument") was recorded in Sarasota County, Florida showing that Margaret N. Handsman, an unmarried woman, mortgaged the property at 7309 Pine Needle Road, Sarasota, Florida. The Mortgage, dated November 24, 1999, shows SunTrust Bank, Gulf Coast as the lender of $818,000 to Handsman. According to a Satisfaction of Mortgage document, filed April 24, 2000, in Sarasota County, this mortgage was satisfied on April 19, 2000.

54.     Victim 6 described Savage/Handsman's Pine Needle Road residence as having a main house with a two-story garage. Savage purportedly planned to use the area above the garage as guest quarters and an office. Victim 6 observed a secret room in the house, which was located

- 12 -

off of an upstairs closet. The house had a gym/exercise room and a wine cellar. Victim 6 stated that Savage owned a Steinway grand player piano and that the house had expensive furnishings. In addition to the Bentleys and Mercedes described above, Victim 6 stated that Savage also owned a Ford Excursion which he equipped with five televisions. Victim 6 said that Savage claimed to have paid $40,000 for a highly trained attack dog named "Versace."

55.    My review of Savage's finances does not reveal a legitimate source of income to support this lifestyle and I have learned that Savage had meager financial resources before meeting Victim 1. According to Victim 3, Savage was sharing an apartment with a roommate in 1995. When he first married Handsman, Savage and Handsman lived in an apartment above his new in-laws' garage. According to Victim 4, in the fall of 1996 Savage and Handsman lived in the Woods Apartments, in Winston-Salem, as set out earlier. Victim 3 advised your affiant that because Savage was unable to make payments on the credit cards she obtained for him, she eventually agreed to pay the first couple of months bills on those cards.

## Internal Revenue Service Records/Evidence of Legal Income

56.    Savage has not filed federal income tax returns for the tax years 1996 through 1999, nor has any income on his behalf been reported to the Internal Revenue Service. According to Victim 1, he has received millions of dollars since 1996 which have been converted to his own use. If one were to credit the affidavit Savage/Racanelli filed in Victim 1's lawsuit against him, he received millions of dollars from Victim 1.

57.    Margaret Handsman filed federal income tax returns for the years 1996, 1997 and 1998, but no federal income tax return was found for the 1999 tax year.

a.    1996: Handsman filed single on her 1996 federal income tax return listing wages of $5,525, interest income of $173 and a business loss of $4,547 for total income of $1,151. The Schedule C business return for dance consulting shows gross business receipts of $5,454. The return lists Handsman's occupation as a dance consultant.

b.    1997, 1998: Although minimal legitimate income and no employment has been verified for Handsman during the years 1997 to the present, Handsman reported income totaling $140,000 from a "dance consulting" business for tax years 1997 and 1998. In 1998, Handsman also reported income from a business, Rich Offerings, Inc. In both 1997 and 1998, Handsman filed as head of household and reported total income of $50,295 and $114,336, respectively. Independent of what Handsman reported on her returns, the only dance-related income reported to the Internal Revenue Service, as being paid to Handsman for tax years 1997 through 1999, was $1,476 paid to Handsman during tax year 1997. In reviewing the bank records and other financial documents relating to Handsman, the only evidence of dance-related income identified during the investigation were checks from the Savage account deposited into Handsman's accounts. These checks contained notations such as "consulting," "dance lessons" and "fee" in the memo section of the checks.

- 13 -

58.    Rich Offerings, Inc. filed a federal income tax return for tax year 1998, but no return was located for tax year 1999.

a.    1998:  The 1998 federal income tax return for S Corporation Rich Offerings, Inc., was signed by Marnie Handsman, President. The business, listed at 1290 N. Palm Avenue, Sarasota, Florida, was incorporated on October 14, 1998. The return shows gross receipts or sales of $26,500 and cost of goods sold of $5,263 for gross profit (and total income) of $21,237. After expenses, the return shows ordinary income of $16,034. Total assets of $16,182 are listed on the return, with $15,149 of this amount being cash.  The business activity is listed as "brokers/consultants" with the product or service shown as jewelry and fine arts. Handsman is listed as the sole shareholder with 100% ownership.

b.    Your affiant's analysis of deposits into the Rich Offerings' business bank accounts reveals little evidence of any legitimate earned income. About one-half of the deposits into these accounts came directly from the Savage and Handsman accounts, while one-fourth of the deposits were in the form of currency, leaving approximately $84,000 as being earned from legitimate sources, although it is not known if this is the case.

### Handsman Role in Savage's Schemes

59.    According to a June 6, 2000, affidavit of one Earl H. Mincemoyer, on or about May 19, 1997, Mincemoyer leased a condominium at 216 Mill Pond Road, Roswell, Georgia, to a "M. John Delano and Margaret Handsman Delano," for the period May 19, 1997 through December 19, 1997. The actual lease shows "Marnie Handsman" as the lessee. During the commencement of the signing of the lease, Margaret Handsman Delano referred to her husband, M. John Delano, as "John."M. John Delano supposedly was the owner of a pager company.  The lease lists the occupants as Marnie Handsman, M. John Delano and Selana Handsman Delano. Your affiant believes that the individuals leasing the Georgia condominium in 1997 were Savage, using yet another alias, and Margaret Handsman, of Winston-Salem.  Selena is the name of their daughter.

60.    Handsman and Savage applied for an MBNA credit card in or about September, 1997. The account application listed Marnie Handsman's employer as the Dance Connection with an annual salary of $90,000, while co-applicant "Mario Racanelli" was listed as an "art broker" at Admiral Art with an annual salary of $100,000. In a Mercedes-Benz Credit Corporation document relating to the purchase of a 1998 Mercedes Benz S600C, for a purchase price of $125,579.95, on February 28, 1998, Handsman was listed as a self-employed "entertainment consultant" with salary or wages of $60,000.  An Olde Discount application, dated April 17, 1998, listed Margaret N. Handsman, of 1425 Market Boulevard, Suite 330-P2, Roswell, Georgia, as the account holder of investment account no. 06204560. Handsman was listed as a "self-employed dance consultant" with an annual income of $50,000.  In a February 11, 1999, application for an account with Bank One, Handsman is listed as the President of Rich Offerings, Inc., a jewelry business, at 1290 N. Palm Avenue, Sarasota, Florida. In an application for credit to Chase Manhattan Bank on April 16, 1999

- 14 -

and relating to the purchase of a 1999 Bentley for $367,784.40, Handsman was shown as having been self-employed for the last twelve years at Rich Offerings, Inc. Handsman was listed as a diamond broker with a gross annual income of $400,000. In November, 1999, Margaret N. Handsman, listed as an unmarried woman, mortgaged the property at 7309 Pine Needle Road, Sarasota, Florida. She claimed to have been self-employed as the President of Rich Offerings, Inc., for two years and one month and that she had been employed in this line of work/profession for ten years. A Chase contract, dated January 3, 2000, listed Handsman as the purchaser of a 2000 (Millennium Edition) Bentley for $333,086. The consumer credit application listed Handsman as the owner of Rich Offerings, a jewelry business, which she had operated for five years. Handsman's gross annual income is listed as exceeding $500,000 with interest income noted.

61.    On October 14, 1999, a Currency Transaction Report (CTR) was filed by Bank of America (formerly NationsBank) relating to two separate cash deposits of $9,200 and $9,000 into the Rich Offerings business account (NationsBank account, no. 0036 6237 7615). Rich Offerings was described on the CTR as a "charitable organization."

62.    In the fifteen months that Rich Offerings maintained the above-described account, between October 23, 1998, and January 18, 2000, a total of approximately $239,000 was deposited into the account. Of that amount, $82,500 came from the "Racanelli" NationsBank account and $16,000 from Handsman's personal checking accounts.

63.    Victim 6 and his wife became socially acquainted with Savage and Handsman in 1999. Neither knew of any employment for Handsman. Victim 6 understood that Handsman was in a North Carolina ballet when she met Savage.

64.    On February 15, 2000, Lyle Robinson, a Florida process server seeking to serve "Mario Racanelli" with the Complaint in Victim 1's civil action, went to 7309 Pine Needle Road, Sarasota, Florida, and spoke with Margaret Handsman. Handsman told him that she was not related to "Racanelli", that he did not live at that address, and that she did not know where he lived.

65.    On March 24, 2000, Sarasota County Sheriff's Deputies attempted to arrest James Anthony Savage, a/k/a Mario Racanelli, at 7309 Pine Needle Road, Sarasota, Florida, based on an Ohio fugitive warrant, for theft, receiving stolen property, forgery and misuse of a credit card. Before going to the address, a call was made to the residence. A male answered the call but refused to answer the question as to whether this was the residence of 7309 Pine Needle Road. Instead, the male put a female on the line, who confirmed the residence and identified herself as "Margaret Handsman." She was asked to go to the front gate of her residence so that deputies could speak with her. Although she agreed to do so, she did not later appear outside the residence.

66.    The deputies were forced to cut a chain securing the front gate and Margaret Handsman, after being shown the warrant, allowed the deputies into the residence. Handsman was asked if James Anthony Savage was present and answered "yes" then corrected herself immediately and said "no." Upon being asked again she responded, "Well, I'm not sure." After approximately

- 15 -

two and one-half hours of searching, a deputy noticed a path worn in the carpet leading underneath a large bookshelf located on the second floor. The deputy attempted to pull the bookshelf away from the wall and then felt the bookshelf being pulled back into place against the wall. Later, several deputies were able to pull the bookshelf away from the wall and found Savage behind the bookshelf standing in an unfinished room equipped with surveillance equipment, including two monitors with the capability of surveilling the interior and exterior of the home. Before the deputies left, Handsman commented that she was married to Savage, a/k/a Racanelli, and had been so for more than four years.

### Nature and Location of Evidence and Proceeds of Criminal Activity - Generally

67. Based upon my training, experience and participation in other financial investigations relating to individuals involved in illegal occupations, I know that:

a. Those who receive significant income from illegal occupations frequently place assets in the names of others (nominees or "straw-men") rather than in their own name, so as to avoid both discovery of their criminal activity and detection of these assets by government agencies;

b. Those involved in illegal occupations often place assets in the names of corporate entities under their direction and control, in order to avoid detection of these assets by government agencies;

c. Even though they may have placed their assets in the names of nominees, or entities, individuals involved in illegal activity generally continue to treat these assets as their own, and to exercise dominion and control over the assets, because they still view the assets as their own personal property;

d. The purpose in concealing their ownership of assets may be to avoid attracting the attention of law enforcement authorities, to mask their connection to the illegal activity, to reduce their exposure to civil litigation, to evade the payment of taxes on income, and/or to prevent forfeiture in the event of prosecution;

e. Those involved in recurring illegal activity frequently maintain on hand large amounts of cash (United States currency). This allows them to make major purchases and pay major expenses by cash rather than by check or credit card. By conducting their financial transactions in this fashion, they hope to avoid banks and the detailed record keeping (paper trail) that bank accounts and credit cards generate. Similarly, because of the illicit nature of their activities, individuals involved in these repeated criminal activities will keep a large reserve of money readily available at all hours of the day, night, or weekend when banks are not open, in order to meet the unexpected problems that may arise from their illegal activities, i.e., arrests of individuals involved, urgent bonds and attorney's fees and/or flight to avoid arrest and prosecution;

- 16 -

f.      Those individuals running a business, be it legitimate or illicit, generally maintain voluminous documents and writings concerning that business, on the property where the business is conducted. These writings may also be in the form of books, records, receipts, bills of sales, guarantees, warranties, bank statements, canceled checks, check books, account receivables, contracts and blank business forms, monthly bills, billing statements, customer lists, notes, ledgers, airline tickets, money orders, lease or ownership agreements, appliance purchase and rental agreements, telephone and utility bills, and other correspondence and mailings as well as license applications, tax payments, vendor contracts, address and telephone lists of individuals from whom the business secures supplies and services. These documents are filed at the business for future reference and are kept and maintained for a period of years for various business purposes, including the securing of future business and answering questions of current customers;

g.      It is common for those involved in illegal occupations to secrete the records of their illegal business in secure locations within their residences, businesses, automobiles, luggage, briefcases, safes, file cabinets, desks, and computers and computer disks, and/or on their persons so that their businesses are "portable," that is, so that they can have ready access to important papers, while hoping to conceal the records from law enforcement. These records and proceeds thus may also be found in detached garages and in outbuildings on the curtilage of the residences;

h.      Persons involved in illegal activities frequently conceal in their residences, businesses, vehicles, garages, storage buildings, and safe deposit boxes, large amounts of currency, financial instruments, precious metals, jewelry, other items of value, and evidence of financial transactions relating to the obtaining, transferring, secreting, or spending large sums of money from their illegal occupation;

i.      Those involved in illegal activities hope to make the money they have earned from their illegal activities appear to have been earned through legitimate means. They may also perform shell transactions and use various business 'fronts' to make the proceeds from their criminal conduct appear legitimate. In so doing, they will use domestic banking facilities and related attendant services, including cashier's and official checks, money drafts, and letters of credit, and may use brokerage houses, and make investments in real estate and personal property, both here and overseas;

j.      I am also familiar with the use of computers for the maintenance of business records and as a means to reach potential investors by means of Internet access.

### The Relocation of Household Effects

68.     There is at present a civil suit pending in United States District Court, Middle District of North Carolina, which names Savage and Handsman as defendants. On August 1, 2000, the Honorable Frank W. Bullock, Jr., United States District Judge, entered an Order of Preliminary Injunction restraining and enjoining Savage and Handsman from disposing of, encumbering, or depleting any interest in any assets of whatever kind, including, but not limited to, the following:

- 17 -

motor vehicles; the real property located at 7309 Pine Needle Road, Sarasota, Florida; any and all bank, investment and financial accounts; items located in safe deposit boxes; and any and all emeralds and diamonds.

69.     According to officials of the Gates Moving & Storage Company, Venice, Florida, on September 26, 2000, their company moved household furnishings from the 7309 Pine Needle Road residence to the Gates Moving and Storage warehouse located at 2216 60th Drive East, Bradenton, Florida.  (In an interview with officials of Gates Moving & Storage Company in December of 2000, your affiant was erroneously advised that the property moved from 7309 Pine Needle Road had been moved to the Gates Moving & Storage warehouse located at 103 James Street, Venice, Florida. On January 10, 2001, Joe Gates, the owner of Gates Moving, advised agents that he had made a mistake in his earlier conversation with agents and that the property had been moved to and remained stored at the Bradenton warehouse location.)  The household furnishings consisted of furniture, "high end electronics", three "plasma flat wall" televisions and imported speakers and a customized golf cart.

70.     Although the property moved by Gates Moving to the Bradenton warehouse was moved from Savage's Pine Needle Road residence, the related bill of lading listed the shipper/customer as Tommy Vayias (a/k/a Tommy Vaylas), with an address of 7309 Pine Needle Road, Siesta Key (a suburb of Sarasota), Florida. On this bill of lading, dated September 20, 2000, Vayias declared the value of this shipment as $250,000.  The inventory of items moved to the Bradenton warehouse includes a piano, stereo and electronic equipment, televisions, bicycles, furniture, and other personal property.  A Gates Moving official also advised your affiant that a customized golf cart had also been moved from the Pine Needle Road residence to the warehouse. Vayias has also made payments to Gates Moving for the shipping and storage expenses related to the property.  As stated earlier, the residence at 7309 Pine Needle Road, Siesta Key (a suburb of Sarasota), Florida was purchased by Margaret N. Handsman with a deed recorded on February 16, 1999. Vayias has at no point during the pendency of this investigation held any recorded interest in this residence.

71.     On October 11, 2000, Gates Moving & Storage officials moved a second shipment of household belongings from the 7309 Pine Needle Road residence to Control Storage Inc. (CSI) located at 6720 South Tamiami Trail, Sarasota, Florida.  Records of Gates Moving & Storage Company list three CSI storage units, identified as E6, E8 and AB58, into which the property was moved.   An official with the moving company has described the second load of household furnishings as including a child's bedroom suit, tires/custom wheels, and personal belongings, including clothing.  The movers report recommending to "John Racanelli" that he store the second shipment with the first shipment in the Gates Moving warehouse, but Savage told him that he needed ready access to these items.  A company official stated that he dealt with "Racanelli" and Tommy Vayias during both of the moving dates mentioned above.  The movers report seeing a computer in the Pine Needle residence but could not recall if and/or where it had been moved. Vayias made the payments to Gates Moving for the shipping expense related to this property.

- 18 -

72. On January 4, 5 and 8, 2001, a detective with the Sarasota County Sheriff's Office contacted an official of Control Storage, Inc. who confirmed that Tommy Vayias was currently renting the following CSI units: E6, E8, AB56, AB40 and AC46. The CSI official recalled Vayias, stating that Vayias was a big guy, who always had on a muscle shirt when he came in and always paid his rent with brand new $100 bills. Personnel with CSI identified a photograph of Tommy Vayias, as the customer referred to above. When asked about unit AB58, CSI officials stated that while there was such a unit, it had never been rented to Vayias (nor Savage/Racanelli), that it was rented by a "museum" business, which had rented AB58 and other units for years.

73. On January 11, 2001, your affiant obtained rental receipts for storage lockers E8 and AB56 from the management of Control Storage Inc., as well as rental receipts for three other storage units AB40 (an 8' x 8' unit), AC46 (a 4' x 8' unit) and E6 (a 10' x 20' unit), all rented in the name of Tommy Vayias, of 2736 Gulf Gate Drive, Sarasota, Florida. E8 and AB56 were rented on October 9, 2000. AB40, AC46 and E6 were rented two days later, on October 11, 2000. As noted earlier, while the units were rented in the name Tommy Vayias, it was Savage who spoke to the movers about storing the goods at a second location and who declared that he needed "ready access" to the items taken from the 7309 Pine Needle Road residence and stored at CSI.

74. Tommy Vayias, who has been identified as an associate of Savage and a frequent visitor to Savage's Pine Needle Road residence, continues to visit the Savage residence every two to three days, including as recently as January 4, 2001, purportedly to pick up the mail. According to information received from law enforcement authorities, Vayias paid a $40,000 cash bond for Savage's release from jail in Collier County, Florida, following his most recent arrest in October of 2000 (violation of domestic violence order obtained by Handsman). Vayias also wired $15,000 from his personal checking account to the account of a Winston-Salem, North Carolina law firm representing Savage in a pending civil suit.

## Subsequent Legal Actions and Results

75. On January 9, 2001, Margaret Handsman, the owner of record of 7309 Pine Needle Road, Sarasota, Florida, gave written consent for the search of these premises. On January 10, 2001, IRS agents conducted a search of the described property. The residence was empty of furnishings for the most part with the exception of a mirrored entertainment center in one room. However, several documents including checks and receipts were located in the residence and/or the adjacent garages. These documents included a business card for Rich Offerings, receipts and duplicate checks, all in the name of Mario Racanelli, a receipt in the name Vayias, an airline tag in the name Christopher M. Smith, deposit tickets for the business Rich Offerings Inc., checks payable to Rich Offerings Inc. with the signature "Marsha S. Cox", deposit tickets in the name Marsha S. Cox, and address labels and other documents in the name Marnie Handsman and M. Handsman.

76. On January 11, 2001, Internal Revenue Service Criminal Investigation agents executed a seizure warrant, MDNC No. 1:01M109 authorized by Magistrate Judge Russell A. Eliason, at the Gates Moving and Storage warehouse located at 2216 60th Drive East, Bradenton,

- 19 -

Florida. The inventory of seized items included furniture, a piano, bicycles, electronics equipment, three "flat screen" or "plasma" televisions, a golf cart and a locked safe. The safe is described as an American Security Products Company AMSEC Millennium (silver edition) safe having Serial Number KS143395 and Model Number AMSEC2000. The key pad serial number is EL49876. On that same day, the above-described property was relocated for safekeeping to Suddath Van Lines, 4756 122nd Avenue, Clearwater, Florida, where it remains.

77.     On January 9, 2001, the United States applied for an exparte order, under Title 18, United States Code, Section 983(j), for a Pre-Complaint Ten Day Restraining Order to enter storage units E8 and AB56 of Control Storage, Inc. located at 6720 South Tamiami Trail, Sarasota, Florida. On January 10, 2001, Pre-Complaint Restraining Orders were issued for the two units by the Honorable Richard A. Lazzara, United States District Judge.

78.     On January 11, 2001, the affiant executed the Court's Restraining Order at the facility named above. Unit E8, a 10' x 20' storage unit, was stacked floor to ceiling with boxes, furniture, and children's toys. Upon making entry to Unit AB56, affiant observed two floor safes, an American Securities Products Company floor safe, model AMSEC 2000, Millennium Silver Edition, Serial Number KS143397, and a Sargent and Greenleaf Incorporated floor safe, Serial Number R15497. The larger of the safes was concealed under a large cardboard box. Both safes were situated within the storage unit in a way to allow easy access. Observed in plain view on top of the second safe were various documents related to James Anthony Savage, including the following: a business card in the name Mario Racanelli showing affiliation with Rich Offerings, 1290 North Palm Avenue, Sarasota; a deposit slip in the name Marsha Cox, a known associate of Savage, showing a $9,900 NationsBank deposit; and a charge slip for the Bal Harbour Resort signed by Mario Racanelli for liquor purchases totaling approximately $1,000.

79.     On January 11, 2001, your affiant filed a detailed Affidavit containing the pertinent facts of the case in connection with her Application to obtain a Search Warrant for the contents of two floor safes, located in Unit AB56 Control Storage Inc. located at 6720 South Tamiami Trail, Sarasota, Florida. On that same date, the Honorable Mark A. Pizzo, United States Magistrate Judge for the Middle District of Florida, sitting in Tampa, Florida, authorized the Search Warrant. The safes are described as follows: one American Securities Products Company floor safe, model AMSEC 2000, Millennium Silver Edition, Serial Number KS143397, and one Sargent and Greenleaf Incorporated floor safe, Serial Number R15497.

80.     That same day the warrant was executed. The American Securities Products Company floor safe, model AMSEC 2000, Millennium Silver Edition, Serial Number KS143397, was found to contain $400,000 in currency, primarily in hundred dollar bills, various documents with the name "Racanelli" on them, VCR tapes, photos, business cards, a black Hermes bag and miscellaneous pornographic materials. The Sargent and Greenleaf Incorporated floor safe, Serial Number R15497, was found to contain rare coins, bank records, checks in the name "Mario Racanelli", a man's wallet, assorted business cards, a cassette tape, a World Series souvenir ticket and miscellaneous documents.

- 20 -

81.    In addition to the safes, storage unit AB56 contained approximately forty-two mover's boxes, most having the name "Allied" and "Gates Moving" embossed on the outside. The boxes generally had handwritten notations also on the outside presumably describing the contents: "mirrors," "clothing," "VCR and wires." The notations seemed to record the room from which the items had been moved, such as "bathroom" and "MBR" [master bedroom].

82.    Your affiant noted that these interior units were not built to be weather-tight, nor to shield the contents from being viewed from outside of the units. There were gaps between doors and the door frames, and portions of the lockers were secured only by heavy-duty fencing.

83.    Your affiant and other agents walked past storage units AB40 and AC46 and were able to see that both held moving boxes of the same general description as those contained in storage units E8 and AB56. They were able to see the writing "Joystick" and "John's Office" on boxes. (When Savage arranged for Gates Moving & Storage to move property from the 7309 Pine Needle Road residence, he did so using the name "John Racanelli.")

84.    On January 11, 2001, while IRS agents were at the CSI storage facility, Tommy Vayias came to the CSI office and paid the rental on the five storage at CSI: E6, E8, AB56, AB40 and AC46. He paid over six hundred dollars for the units and paid in cash, using six hundred dollar bills and other currency. IRS agents Ted Warren and Daniel Guerrini conversed with Vayias after he paid the rental and while, at first, Vayias told the agents that the property in the lockers was his, he eventually admitted that all property contained in the five storage units consisted of property removed from the 7309 Pine Needle Road residence. Vayias resides at a different address.

85.    After reviewing the storage unit rental documents, (and noting that all five units were rented in two days in October, 2000, in the name Tommy Vayias), and interviewing the movers from Gates Moving & Storage, learning what Vayias told agents Warren and Guerrini, and noting the apparent similarity of the contents of the lockers, your affiant believed that household property was relocated from the 7309 Pine Needle Road residence, and moved by Gates Moving & Storage employees around October 11, 2000, into five storage units rented in the name of Tommy Vayias, 2736 Gulf Gate Drive, Sarasota, Florida. Those five units were: CSI units E6, E8, AB56, AB40 and AC46. Your affiant also concluded that the original movers were in error when they recalled for her that the number of the third storage locker into which they put property from the Pine Needle Road residence was number AB58.

86.    On Thursday, January 11, 2001, and Friday, January 12, 2001, the Honorable Russell A. Eliason, United States Magistrate Judge for the Middle District of North Carolina, authorized seizure warrants, MDNC # 1:01M113 for storage units E6 and E8 and MDNC # 1:01M114 for storage units AB56, AB40 and AC46, respectively. On Friday, January 12, 2001, your affiant and other IRS agents executed these seizure warrants. An inventory of the contents seized from these units included furniture and household furnishings, clothing, televisions, bicycles, a safe, a shredder, computer towers and equipment, a dishwasher and an oven. On that same day, the above-described property was relocated for safekeeping to Suddath Van Lines, 4756 122nd Avenue, Clearwater,

- 21 -

Florida, where it remains.

87.    On Tuesday, January 30, 2001, Tommy Vayias stated that during the week following the search and seizures described above, he employed the services of Six Brothers Helping Others to assist him in moving property belonging to James Savage into a twenty to twenty-four foot rented Penske truck. Property belonging to Savage was moved from Tommy Vayias' residence, at 2736 Gulf Gate Drive, Sarasota, Florida, Hideaway Self Storage, at 8901 South Tamiami Trail, Sarasota, Florida, and StorMax Self Storage, at 4250 34th Street, Saint Petersburg, Florida. Vayias stated that the items moved from these locations included electronics, including televisions and speakers, a "kit" removed from a Mercedes, wheels, tires, golf clubs, paintings and artwork, an ottoman, clothing, crystal statues, kitchen appliances, telephones, and approximately four hundred bottles of wine and other miscellaneous personal property. At Savage's instruction, Vayias drove the truck to a mall across from the Newark, New Jersey airport where he met Savage on or about Friday, January 19, 2001. Vayias and Savage drove to the Public Storage facility on Route 17 in what Vayias believed was Paramus, New Jersey. The correct name and address of the facility is actually Rochelle Park Public Storage, 168 Route 17 North, Rochelle Park, New Jersey. At this location, Savage rented a storage unit, possibly in the Racanelli name, and then with the assistance of Vayias unloaded the contents of the truck into the unit.

88.    On January 31, 2001, management of the Public Storage location at 168 Route 17 North, Rochelle Park, New Jersey, stated to IRS Special Agent Mike Connolly that on January 18, 2001, Mario Racanelli and another male rented a 10' x 20' storage unit, number 1022. Racanelli paid $800 in cash for three months rent on the unit. The rent was paid in $50 and $100 dollar bills removed from a leather briefcase containing a large amount of currency. Savage (Racanelli) and his companion were driving a large yellow truck on this date.

89.    On Thursday, February 1, 2001, the Honorable Russell A. Eliason, United States Magistrate Judge for the Middle District of North Carolina, authorized a seizure warrant, MDNC #1:01M127, for the seizure of personal property contained in storage unit 1022 located at Rochelle Park Public Storage, 168 Route 17 North, Rochelle Park, New Jersey. On Friday, February 2, 2001, IRS Special Agent Dan Guerrini and other IRS agents executed this seizure warrant. An inventory of the contents seized from this units included audio and video equipment, television and audio stands, golf clubs, golf balls, golf bags, tires, houseware items, surveillance equipment, artwork, a money counter, and assorted wines and liquors.

90.    On that same date, Special Agent Guerrini spoke with Henry Diaz, the property manager for Rochelle Park Public Storage, who stated that he rented storage unit 1022 to "Mario Racanelli" on January 18, 2001. Diaz stated that "Racanelli" paid $709.65, in currency, to rent the unit until March 1, 2001. The cash was paid primarily in fifty and one hundred-dollar denominations. Diaz stated that when "Racanelli" removed this currency from a leather briefcase that he was carrying, he observed a substantial amount of currency remaining in the briefcase.

- 22 -

91.     On Tuesday, January 30, 2001, Tommy Vayias also stated that he was aware of an additional mini-storage unit containing property belonging to James Anthony Savage. This unit, number 972 at Storage USA, 4173 Clark Road, Sarasota, Florida, was rented in Vayias' name but contains property belonging to Savage. According to Vayias, the major items in this storage unit are two large refrigerators and a custom designed mailbox. Vayias also stated that he intended to remove his name from the rental agreement.

**Conclusion**

92.     In summary, beginning in 1996, and continuing to the present, James Anthony Savage, also known as Mario J. Racanelli, John Racanelli, Mark Racanelli, M. John Delano, Grandoni Egistot, Egisto Grandoni, Greg Eric Masonotti and Robert Toliano, and others have been involved in operating a series of fraudulent schemes by inducing investors to put money into fictional communication, waste disposal and jewelry-oriented businesses. Instead, Savage and Handsman have used the monies invested to support their lavish lifestyle. I believe that the interstate mail and wire facilities have been utilized to perpetrate their illegal activities, in violation of Title 18, United States Code, Sections 1341 and 1343, and that Savage and others have used bank accounts at Bank of America, SunTrust Mortgage, and other banks, to engage in monetary transactions in criminally derived property of more than $10,000, which property was derived from specified unlawful activity, namely mail and wire fraud, in violation of Title 18, United States Code, Section 1957.

Based upon the information contained in this Affidavit, there is probable cause to believe that the property located in storage unit 972 at Storage USA, 4173 Clark Road, Sarasota, Florida, including two refrigerators, a custom mailbox, and other property, is owned by James Anthony Savage, also known as Mario J. Racanelli, John Racanelli, Mark Racanelli, M. John Delano, Grandoni Egistot, Egisto Grandoni, Greg Eric Masonotti and Robert Toliano, and his wife Margaret "Marnie" Racanelli, a/k/a Margaret Nathalie Handsman, and constitutes or is derived from proceeds traceable to an offense constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), or a conspiracy to commit such offense, including violations of Title 18 U.S.C. §§ 1341, 1343 (mail and wire fraud), 2314 (interstate transportation of money taken by fraud) and/or 1956(h) and 1957 (money laundering), and is therefore subject to seizure and forfeiture pursuant to 18 U.S.C. § 981.

- 23 -

Further, Affiant sayeth not.

_Merri Lynne Conrad_
Merri Lynne Conrad, Special Agent
Internal Revenue Service

SWORN TO AND SUBSCRIBED before
me this the _9rd_ day of _February_ , 2001.

United States Magistrate Judge
Middle District of North Carolina

- 24 -