IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| JAMES ANTHONY SAVAGE, | : | 1:01CR362-1 |
| also known as Mario J. Racanelli, | : | |
| John Racanelli, Mark Racanelli, | : | |
| Grandoni Egistot, Egisto Grandoni, | : | |
| Robert Toliano, M. John Delano, | : | |
| Greg Eric Masonotti, and Max | : | |
| Marrache | : | |
| MARGARET NATHALIE HANDSMAN, | : | 1:01CR362-2 |
| also known as Marnie Handsman, | : | SUPERSEDING |
| Margaret Racanelli, and Marnie | : | |
| Racanelli | : | |

## GOVERNMENT'S SECOND MOTION IN LIMINE

NOW COMES the United States of America, by and through Anna Mills Wagoner, United States Attorney for the Middle District of North Carolina, and files a motion in limine advising the Court that it will seek to elicit testimony with respect the reasons for which there were two separate arrests of Defendant Savage in March, 2000. In support whereof, the United States shows the following:

1. **March 8, 2000 Rohypnol arrest, Sunny Isles Beach, FL.**

On March 8, 2000, Defendant Savage was arrested in Sunny Isles Beach, Florida (a suburb of Miami), on charges of trafficking in Rohypnol (Flunitrazepam, commonly known as the "date rape" drug) and possession of a counterfeit drivers license (a Florida drivers license in the name "Mario Racanelli," of 1290

N. Palm Avenue, Sarasota, Florida).

At approximately 10:30 p.m. on that date, Sunny Isles Beach police officers responded to a complaint that an individual traveling in a white limousine was threatening to shoot someone with a machinegun. When officers responded they observed Savage standing alongside a limousine. Upon announcing their presence, Savage ignored police warnings to step away from the limousine and started to reach into the back seat. In the back seat police later found 46 dosage units of Rohypnol and an open brown bag containing $12,228 in currency. Savage told the arresting officers that his name was "Grandoni Egistot," and provided police a Canadian photo identification in the name "Grandoni Egistot," a Canadian photo identification in the name "Robert Toliano," and a Canadian passport in the name "Robert Toliano." He reported his occupation as "millionaire" and place of birth as Canada. A false Florida drivers license was also located in Savage's wallet. Savage was depicted in all the false identifications, in the names of Grandoni Egistot, Robert Toliano and Mario Racanelli. Sharon Taft, who identified herself as Savage's girlfriend, told police that the bag containing the drugs belonged to Savage. Trial in this case was scheduled for February 2, 2001. On that date, Savage failed to appear and a warrant was issued for his arrest.

On March 9, 2000, Christopher M. Smith of 11051 130th Avenue

North, Largo, Florida, an associate of Savage, paid a $20,000 cash bond, using U.S. currency, for Savage's release related to the arrest above (in the name Grandoni Egistot).

2. March 21, 2000 fugitive arrest, Sarasota, FL.

On March 21, 2000, Sarasota County Sheriff's Deputies attempted to arrest James Anthony Savage, a/k/a Mario Racanelli, at 7309 Pine Needle Road, Sarasota, Florida, based on an Ohio fugitive warrant, for theft, receiving stolen property, forgery and misuse of a credit card. Before going to the address, a call was made to the residence. A male answered the call but refused to answer the question as to whether this was the residence of 7309 Pine Needle Road. Instead, the male put a female on the line, who confirmed the residence and identified herself as "Margaret Handsman." She was asked to go to the front gate of her residence so that deputies could speak with her. Although she agreed to do so, she did not later appear outside the residence.

The deputies were forced to cut a chain securing the front gate and Margaret Handsman, after being shown the warrant, allowed deputies into the residence. Handsman was asked if James Anthony Savage was present and answered "yes" then corrected herself immediately and said "no." Upon being asked again she responded, "Well, I'm not sure." After approximately two and one-half hours of searching, a deputy noticed a path worn in the

3

carpet leading underneath a large bookshelf located on the second floor. The deputy attempted to pull the bookshelf away from the wall and then felt the bookshelf being pulled back into place against the wall. Later, several deputies were able to pull the bookshelf away from the wall and found Savage behind the bookshelf standing in an unfinished room equipped with surveillance equipment, including two monitors with the capability of surveilling the interior and exterior of the home. Before the deputies left, Handsman commented that she was married to Savage, a/k/a Racanelli, and had been so for more than four years.

The government seeks to introduce evidence of the above arrests in order to fully explain the officers actions in each instance. Evidentiary rulings of the trial court are entitled to substantial deference and will not be disturbed absent a clear abuse of discretion. United States v. Russell, 971 F.2d 1098, 1104 (4th Cir. 1992), cert. denied, 506 U.S. 1066 (1993).

The government contends that this evidence is not prohibited by Federal Rule of Evidence 404(b) and is admissible in that it "sufficiently relates to the charged offense" and "furnishes part of the context of the crime". See United States v. Mark, 943 F.2d 444, 447-448 (4th Cir. 1991) (quoting United States v. Rawle, 845 F.2d 1244, 1247, n.3 (4th Cir. 1988)). To exclude the evidence would force the jury to engage in speculation concerning the

4

justification for the officers actions.

The issue before the court has been discussed in the Fourth Circuit by unpublished opinion. In <u>United States v. McGrady</u>, ___ F.3d ___, 1999 WL 95633 15166 at \*\*4-5 (4th Cir., Feb. 7, 1999)(attached), a DEA agent testified that a defendant had provided a false name during his arrest, and explained that he was traveling under a false name because of outstanding arrest warrants in Florida, a fact that the agent later confirmed. The defendant claimed on appeal that evidence of the outstanding arrest warrants violated Federal Rules of Evidence 404(b) and 403.

The Fourth Circuit disagreed, holding that the challenged testimony did not constitute "other crimes" evidence within the meaning of Rule 404(b), citing <u>United States v. Kennedy</u>, 32 F.3d 876 (4th Cir. 1994), <u>cert. denied</u>, 513 U.S. 1128 (1995), for support. In <u>Kennedy</u>, the Court held that "evidence of uncharged conduct is not considered other crimes evidence if it' arose out of the same ... series of transactions as the charged offense, ... or if it is necessary to complete the story of the crime [on] trial.' " <u>Id.</u>, at 885.

The Court also found that testimony as to the outstanding warrants was not "other crimes" evidence because it "served to complete the agent's account of the his dealings with the defendant and was not introduced primarily to establish

5

propensity to commit the crime charged." McGrady, 1999 WL 95633 at **5(citing United States v. Masters, 622 F.2d 83, 87 (4th Cir. 1980, citing United States v. Bloom, 538 F.3d 704, 707 (5th Cir. 1976, cert. denied, 429 U.S. 1074 (1977)). In addition, Rule 404(b) was characterized as an "inclusive rule," excluding only evidence with the sole purpose of demonstrating bad character of the defendant. McGrady, 1999 WL 95633 at **5 (emphasis added). The Court further concluded that the district court had not abused its discretion in finding that the evidence was not unduly prejudicial under Rule 403. Id.

Based upon the foregoing facts and authorities cited, the United States requests that testimony be allowed concerning the two arrests of Defendant Savage in March, 2000.

This the  4 Td  day of March, 2002.

                            Respectfully submitted,

                            ANNA MILLS WAGONER
                            United States Attorney

                            *Clifton T. Barrett*
                            CLIFTON T. BARRETT by DC
                            Assistant United States Attorney
                            NCSB #12858

                            *Douglas Cannon*
                            DOUGLAS CANNON
                            Assistant United States Attorney
                            NCSB #8604

                            P. O. Box 1858
                            Greensboro, NC  27402

                            336/333-5351

CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of North Carolina and is a person of such age and discretion as to be competent to serve papers.

That on this the 4th day of March, 2002, she served a true and correct copy of the foregoing Response by hand-delivery or first class mail, postage prepaid, to the person hereinafter named:

Addressee:

Nils E. Gerber
Attorney at Law
200 Brookstown Avenue, Suite 304
Winston-Salem, NC 27101

Lisa S. Costner
Attorney at Law
200 Brookstown Avenue, Suite 304
Winston-Salem, NC 27101

Kristen L. Majors

KRISTEN L. MAJORS
Paralegal Assistant
United States Attorney's Office

P.O. Box 1858
Greensboro, NC  27402
336/333-5351

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.

UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Ellancer Allen MCGRADY, a/k/a Lance, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Everett Dione MCGRADY, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Roddrick Kemtrell MCDONALD, a/k/a Nerk, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Wayne Horace JOHNSON, Defendant-Appellant.

Nos. 96-4269, 96-4288, 96-4270, 96-4271.

Argued Dec. 4, 1998.
Decided Feb. 17, 1999.

Appeals from the United States District Court for the Western District of North Carolina, at Shelby. Richard L. Voorhees, Chief District Judge.(CR-94-44).

Charles Robinson Brewer, Asheville, North Carolina, for Appellant, Everett McGrady.

Sandra Jean Barrett, Asheville, North Carolina, for Appellant McDonald.

Roger Theodore Smith, Asheville, North Carolina, for Appellant Ellancer McGrady.

Eric Jason foster, Pitts, Hay, Hugenschmict & Devereaux, P.A., Asheville, North Carolina, for Appellant Johnson.

ON BRIEF: Timika Shafeed, Office of the United States Attorney, Charlotte, North Carolina, for Appellee.

Brian Lee Whisler, for Appellee.

Before MICHAEL and MOTZ, Circuit Judges, and GOODWIN, United States District Judge, for the Southern District of West Virginia, sitting by designation.

OPINION

PER CURIAM.

**1 A jury convicted Ellancer Allen McGrady, Everett Dione McGrady, Roddrick Kemtrell McDonald, and Wayne Horace Johnson of conspiracy to possess with intent to distribute cocaine and cocaine base, as well as various related counts. They appeal, challenging their convictions and sentences. Because the district court erred in imposing, pursuant to U.S.S.G. § 2K1.1, a two-level enhancement to Ellancer McGrady's base offense level, we vacate his sentence and remand to the district court for resentencing. In all other respects, we affirm.

I.

A grand jury returned a 37-count indictment against the four appellants and sixteen co-conspirators. The indictment charged all defendants with conspiracy to possess with intent to distribute more than 500 grams of cocaine and more than 50 grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846. In addition, Ellancer McGrady and Everett McGrady were charged with possession of cocaine base with intent to distribute in violation of § 841(a)(1), and with aiding and abetting that violation.

The trial was held in the Asheville division of the Western District of North Carolina before a jury from that division. Before trial, appellants unsuccessfully argued that the racial composition of the jury venire denied them a fair trial.

After a four day trial, the jury convicted appellants of conspiracy. It also convicted Ellancer McGrady of six counts and Everett McGrady of one count of possession with intent to distribute cocaine base.

Appellants moved for a new trial on the ground that an important government witness recanted her testimony after trial. Following a hearing, the district court denied appellants' motions. The court then imposed these sentences: Ellancer McGrady--life for the conspiracy count and twenty year terms on the six substantive counts, all to be served concurrently; Everett McGrady--two terms of 235 months, to be served concurrently; McDonald--292 months; and Johnson--235 months.

On appeal, appellants challenge their convictions and sentences on numerous grounds. We address, in turn, the challenges to the convictions and then those to the sentences.

## II.
### A.

Appellants argue that the jury selection process violated the Sixth Amendment's requirement that the jury venire be drawn from a "fair cross- section" of the community. *See Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

Juries in all five divisions of the Western District of North Carolina are selected according to the District Jury Selection Plan in which potential jurors are randomly selected from the voter registration lists of the division where the trial is held. Appellants were indicted in the Shelby division of the district. Because the Shelby division no longer has a suitable federal courthouse, virtually all cases originating in that division are tried in the neighboring Asheville division of the same district. Thus, Asheville division jury pools are used in cases that originate in the Shelby division.

**2 Information from the 1990 census demonstrates that African-Americans comprise 11.9% of the general population and 9.34% of the registered voters in the Shelby division. By contrast, in the Asheville division, African-Americans comprise 4.9% of the general population and 3.47% of the registered voters. Moreover, appellants submitted evidence that the Asheville division jury venires contained no African-Americans during the January 1995 term when they were tried, or during the March 1995 and July 1995 terms. Two African-Americans reported for jury duty in the May 1995 term. Appellants submitted a letter from a statistician indicating that the probability of four venires containing only two African-Americans due strictly to chance was only one percent. Appellants argue that this statistical data demonstrates that African-Americans were systematically excluded from jury venires in the Asheville division.

The Sixth Amendment affords criminal defendants the right to a juror selection process that draws from a fair cross-section of the community. *United States v. Cecil,* 836 F.2d 1431, 1445 (4th Cir.1988). To establish a prima facie violation of the fair cross-section requirement, a defendant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). The parties agree that the first prong has been satisfied. Accordingly, we examine the remaining two elements.

We have upheld the practice of randomly drawing jurors from a state's voter registration list, even though minority representation on voter rolls is sometimes less than in the general community. *Cecil,* 836 F.2d at 1444. In *Cecil,* we explained that the use of voter lists was as fair a process as was feasible for a state to undertake because people eligible for jury duty could place themselves in the pool of potential jurors simply by registering to vote. In this case, although we know that in the Asheville division African-Americans constitute 4.9% of the general population but only 3.47% of the registered voters, we cannot determine the exact number of eligible African-Americans excluded from the jury pools because appellants have not demonstrated the portion of the African-American general population that is eligible to vote. Regardless, the disparity between the African-American population and African- American registered voters is neither unfair nor unreasonable. *See Cecil,* 836 F.2d at 1451-53.

Nor does the fact that African-Americans comprised only 1.25 percent of the jurors on four random venires demonstrate that the exclusion of minorities was due to the sort of discriminatory "system" outlawed in *Taylor* and *Duren.* In those cases the state's selection plans automatically *exempted* all or certain women from jury service under certain circumstances. *Duren,* 439 U.S. at 359; *Taylor,* 419 U.S. at 523. This systematic exclusion of women led to a severe underrepresentation of women in venires, when compared to those women eligible to vote.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

*Duren,* 439 U.S. at 365 (relying on data that showed that women comprised 54 percent of the local population, but only approximately 15 percent of venire jurors); *Taylor,* 419 U.S. at 524 (noting that women comprised 53 percent of the persons eligible for jury service, but only 10 percent of the persons on the jury wheel).

**\*\*3** In the present case, even assuming there is an unfair or unreasonable representation of African-Americans in jury venires, the lack of African-Americans in the four jury venires is not due to any "systematic" exclusion. Rather, the lack of African-Americans on four jury venires is due to the fact that African-Americans constitute less than four percent of the population eligible to serve on juries. [FN1] Appellants' proof that four jury panels contained proportionally fewer African-Americans than were eligible for jury duty is insufficient evidence that North Carolina "systematically" or "intentionally" excludes African-Americans by its procedure. *See Cecil,* 836 F.2d at 1445 ("Constitution does not require that juror selection process be a statistical mirror of the community").

> FN1. Two of the 160 jurors (1.25 percent) who reported for duty in January, March, May, and July of 1995 were African-Americans. The statistician's conclusion that the probability of this happening by chance was only one percent is based on the representation of African-Americans in the general population, not on the number of African-American registered voters.

Appellants further contend that since they were indicted in the Shelby division we should look to the proportion of African-Americans in the population or among registered voters in the Shelby division in deciding whether the absence of African-Americans from the jury venire was unfair, unreasonable, and systematic. Thus, under appellants' view, a "fair cross-section of the community" refers to a "fair cross-section of the *division* in which a defendant was indicted." Appellants cite no legal authority for this argument. The Sixth Amendment grants the "right to a speedy and public trial, by an impartial jury *of the State and district wherein the crime shall have been committed."* U.S. Const. amend. VI (emphasis added). Thus, it gives no comparable right to trial in the *division* where the crime was committed. Furthermore, Federal Rule of Criminal Procedure 18 only requires that the "prosecution be had in a *district* in which the offense was committed." Fed.R.Crim.P. 18 (1998). Rule 18 was, in fact,amended in 1966 to eliminate the requirement that the prosecution be in the *division* in which the offense was committed. *See id.* advisory committee's note. Moreover, Rule 18 specifically authorizes a change in venue to another division where it would further "the prompt administration of justice." Fed.R.Crim.P. 18; *see also* 2 Charles Alan Wright *Federal Practice and Procedure: Criminal 2d* § 305 (1982 and Supp.1998). The difficulty in securing a courthouse in the Shelby division justified a change in venue under this rule. Thus, there is no constitutional right to trial within a certain division. *See United States v. Anderson,* 328 U.S. 699, 704-05, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946). Appellants' reliance on the Shelby division population figures for their fair cross-section claim is therefore unavailing.

B.

Appellants next contend that there was a fatal variance between the conspiracy charged in the indictment and the evidence adduced at trial. The first count of the indictment alleged that appellants and sixteen others conspired to possess with intent to distribute cocaine and cocaine base from "[i]n or about 1989 or 1990, and continuing until on or about March 8, 1994." The evidence, viewed in the light most favorable to the Government, establishes a conspiracy beginning in 1992 or 1993, rather than in 1989 or 1990. The evidence also showed that Charles Mayse, one of the co-conspirators, bought drugs from a different supplier before he began buying from Ellancer McGrady. Appellants apparently contend that Mayse's activity prior to meeting Ellancer McGrady in 1992 or 1993 constituted a separate conspiracy, and that the evidence of multiple conspiracies within the time frame set forth in the indictment resulted in a fatal variance.

**\*\*4** The mere fact that the evidence showed that the conspiracy did not begin until some time after the date alleged in the indictment does not warrant reversal. *United States v. Queen,* 132 F.3d 991 (4th Cir.1997). In *Queen,* we held that "the trier of fact may find that the starting date of a conspiracy begins anytime in the time window alleged, so long as the time frame alleged places the defendant sufficiently on notice of the acts with which he is charged." *Id.* at 999. We reasoned that the indictment placed the defendant on notice by specifically alleging which acts were part of the ongoing conspiracy. *Id.* In the present case, the thirty-seven count indictment identified dates in 1992, 1993, and 1994 on which the various defendants allegedly committed certain crimes, putting them on notice of the acts with which

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

they were charged.

Furthermore, a variance does not constitute reversible error unless it prejudices the defendant. *United States v. Coward,* 630 F.2d 229, 231 (4th Cir.1980) (citing *Berger v. United States,* 295 U.S. 78, 81, 83-84, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). In this case, appellants have not disputed that the evidence demonstrates the existence of a single conspiracy beginning in 1992 or 1993. Moreover, appellants have only identified a few lines of testimony regarding Mayse's criminal activity prior to meeting Ellancer McGrady. This scant evidence could not so confuse the jury as to prejudice appellants and justify reversal. *See United States v. Kennedy,* 32 F.3d 876, 883 (4th Cir.1994) ("A variance constitutes a legitimate grounds for reversal only if the appellant shows that the variance infringed his 'substantial rights' and thereby resulted in actual prejudice.").

C.

At trial, DEA agent Rick Webster testified that McDonald, in violation of Georgia law, had given him a false name at an airport on April 7, 1994, and that a search of McDonald's person and carry-on bag revealed $3000 in cash and two airline tickets purchased under false names. The agent also testified that McDonald explained that he was traveling under a false name because of outstanding arrest warrants in Florida, a fact that the agent later confirmed. McDonald asserts that the district court's failure to exclude the testimony about his use of false names, the $3000, and the Florida arrest warrants violated Federal Rules of Evidence 404(b) and 403. We review a district court's evidentiary rulings for an abuse of discretion. *See United States v. Sanchez,* 118 F.3d 192, 195 (4th Cir.1997).

Rule 404(b) prohibits the use of "other crimes, wrongs, or acts ... to prove the character of a person." Fed.R.Evid. 404(b) (1998). However, the challenged testimony here did not constitute "other crimes" evidence within the meaning of Rule 404(b). *Kennedy,* 32 F.3d at 885. In *Kennedy* we held that "evidence of uncharged conduct is not considered 'other crimes' evidence if it' arose out of the same ... series of transactions as the charged offense, ... or if it is necessary to complete the story of the crime [on] trial.' " *Id* (citations omitted). Furthermore, the mere fact that the evidence involved activities occurring outside the charged time frame of the conspiracy "does not automatically transform that evidence into 'other crimes' evidence." *Id.* Thus, we have held that evidence of a defendant's drug distribution activities with suppliers not named in the indictment is not "other crimes" evidence because it provided "background information" that helped "complete the story of the crime on trial." *Id.* at 886.

**\*5** Similarly, the evidence of the cash and McDonald's use of false names is not evidence of "other crimes." Rather, this evidence merely related events that arose from conduct consistent with, and connected to, the charged conspiracy. It is certainly not uncommon for drug couriers to use false names or carry large amounts of money. Thus, the challenged testimony regarding the false names and money--even though the incident occurred after the date of the charged conspiracy--introduced substantive evidence that "completed the story of the conspiracy."

Furthermore, the testimony as to the outstanding warrants was not "other crimes" evidence because it "served to complete the agent's account of the [his] dealings with [the defendant], and was not introduced primarily to establish propensity to commit the crime charged." *United States v. Masters,* 622 F.2d 83, 87 (4th Cir.1980) (citing *United States v. Bloom,* 538 F.3d 704, 707 (5th Cir.1976)). Agent Webster did not imply that the warrants themselves were related to a drug enterprise. Rather the agent merely testified to the explanation that McDonald had given to him when he questioned McDonald's use of a false name. The agent explained that he checked the warrants, that they were misdemeanor warrants and that the local authorities would not expedite them. Rule 404(b) is characterized as an "inclusive rule," excluding only evidence with the sole purpose of demonstrating bad character of the defendant. *Masters,* 622 F.2d at 85. Thus, the evidence of other crimes must be relevant for a purpose "other than showing the character or disposition of the defendant." *Id.* In this case, the evidence of the warrants was not introduced to demonstrate bad character.

Of course, even evidence that satisfies Rule 404(b) may be excluded under Rule 403 if unduly prejudicial. *United States v. Mark,* 943 F.2d 444, 448 (4th Cir.1991). However, we cannot say that the district court abused its discretion in concluding that this evidence was not unduly prejudicial. *Cf. United States v. Rawle,* 845 F.2d 1244, 1247 (4th Cir.1988) (admission of testimony that defendant had transported drugs on prior occasions was consistent with Rule 403 in part because it showed scheme or

plan and therefore had significant probative value). Indeed, the testimony as to the outstanding warrants supplied the jury with an alternative explanation for McDonald's use of false names unrelated to his participation in the conspiracy. The likelihood of the challenged evidence prejudicing McDonald was actually reduced because of the exculpatory nature of the evidence of outstanding warrants in this instance.

### D.

Appellants argue that the district court erred in denying their motions for a new trial after an important government witness recanted her testimony. We review a district court's denial of a motion for new trial for an abuse of discretion. *United States v. Dorlouis,* 107 F.3d 248, 254 (4th Cir.1997). Furthermore, "[f]indings of the district court made on a motion for new trial based on newly discovered evidence should not be disturbed except for most extraordinary circumstances and unless it clearly appears they are not supported by any evidence." *United States v. Carmichael,* 726 F.2d 158, 160 (4th Cir.1984) (citing *United States v. Johnson,* 327 U.S. 106, 111, 112 (1946)).

**\*\*6** At trial, Anita Whiteside testified for the Government that Ellancer McGrady had given her drugs and sold them out of his house. She also testified that Ellancer McGrady cooked powder cocaine into base and that Johnson and McDonald supplied her with drugs. Although Whiteside admitted that she had used drugs heavily in the past, she claimed to be clean during the trial.

There can be little doubt as to the importance of Whiteside's testimony to the Government. In his closing argument, the prosecutor described Whiteside as "a powerful witness." The Government later stipulated that it had relied on her testimony at trial. The district judge added that he thought it was "critical testimony."

After the verdict but prior to sentencing, Whiteside met with Johnson and told him that she had testified falsely at trial. His lawyer moved for a new trial based on Whiteside's admission that her trial testimony implicating Johnson had been false.

At a hearing on the motion for a new trial, Whiteside testified that Johnson "never sold me nothing." She stated that she had been using drugs at the time of the trial and had lied about that fact. She explained that she was admitting her lies because her recovery program required her to make amends for the wrongs she had done while using drugs. She also testified that government agents gave her money before she testified, and that she used this money to get high. (A state agent later confirmed making seven payments to Whiteside, totaling $550, for help locating witnesses and for information in an unrelated gambling case.) Whiteside further stated that she had told defense counsel that she was scared of being charged with perjury and that she felt pressured not to disappoint the Government.

In denying appellants' motions for new trial, the district court applied the test we adopted in *United States v. Wallace,* 528 F.2d 863 (4th Cir.1976). Pursuant to it, a court should grant a new trial based on a witness's recantation only when it concludes:

> (a) [That it] is reasonably well satisfied that the testimony given by a material witness is false.
> (b) That without it the jury might have reached a different conclusion.
> (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*Id.* at 866 (citing *Larrison v. United States,* 24 F.2d 82, 87-88 (7th Cir.1928) (citations omitted)). The district court held that neither the first nor the third requirement had been satisfied. Because we conclude that the court did not abuse its discretion in finding that the first requirement had not been met, we need not reach the question of whether the third requirement was satisfied.

In denying the motion for a new trial, the district court relied heavily on Whiteside's demeanor. The court described it as "credible" at trial, noting her ability to withstand thorough cross-examination by four defense attorneys. By contrast, the court described Whiteside's testimony at the motion hearing as "evasive and unfocused," explaining that "[s]he avoided all eye contact and appeared to be very distracted." The district court further noted that her hearing testimony did not constitute a recantation of trial testimony, but a statement of uncertainty as to what had occurred. Whiteside's hearing testimony, the court found, consisted largely of vague statements that she did not remember events before trial or her testimony at trial, and assertions that she lied a lot and had difficulty separating truth from fiction when she was high.

**\*\*7** We cannot evaluate Whiteside's demeanor and

must rely on the district court for its assessment. We can, however, agree that her testimony at the subsequent hearing was more an expression of uncertainty about past events than a recantation of false testimony. She did state that Johnson had not supplied her with cocaine but the credibility of this statement must be measured against her overwhelming uncertainty about the bulk of her trial testimony and almost all other events relevant to the trial. Moreover, the district court could have credited Whiteside's trial testimony over her subsequent testimony at the hearing because, as the court observed, her trial testimony "was closer in time to the relevant events and much more lucid."

Appellants present several good reasons why Whiteside may have been motivated to lie at trial, as well as reasons why she would be motivated to tell the truth at the subsequent hearing. However, equally persuasive is the fact that Johnson had access to Whiteside prior to her recantation and evidence that Johnson and Everett McGrady allegedly tried to intimidate Whiteside after she testified at the trial. *See United States v. Johnson,* 487 F.2d 1278 (4th Cir.1973) (in denying motion for new trial, court considered that defendant had access to witness). In sum, the district court did not abuse its discretion in denying appellants's motion for a new trial.

III.

Appellants also raise several challenges to their sentences.

A.

The district court increased Ellancer McGrady's offense level by two levels for possession of a firearm during a drug offense pursuant to U.S.S.G. § 2D1.1(b)(1). McGrady argues that the district court erred in relying on hearsay testimony that he possessed a firearm because that testimony did not have sufficient indicia of reliability as required by § 6A1.3(a).

Section 2D1.1(b)(1) directs a sentencing court to increase the base offense level by two where "a dangerous weapon (including a firearm) was possessed" by the defendant. This adjustment should be applied "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." § 2D1.1(b)(1), commentary 3. The Government must prove that the defendant possessed a weapon, under these circumstances, by a preponderance of the evidence. *See United States v. Urrego-Linares,* 879 F.2d 1234, 1237-38 (4th Cir.1989).

Section 6A1.3(a) of the Sentencing Guidelines provides that when considering a factor important to the sentencing determination, "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." We have expressly condoned the use of "reliable hearsay" at sentencing. *See United States v. Love,* 134 F.3d 595, 607 (4th Cir.1998).

**8 The presentence investigation report asserted that McGrady possessed two Uzi type weapons, a gun with white handles, a 9 millimeter pistol, a Smith & Wesson Model 10, and a .38-caliber revolver. After McGrady objected that no evidence was adduced at trial to support these allegations, the probation office recommended that the Government introduce evidence to address this issue at sentencing.

At the sentencing hearing in 1996, narcotics officer David Petty testified regarding a March 24, 1994 interview he had conducted with Shameca Hughes. Hughes was a cooperating witness at trial who had charges alleging aiding and abetting in the sale and delivery of cocaine pending at that time. The Government had granted her immunity for her testimony. Petty testified that Hughes told him that she and Sherry Waters were at Charles Mayse's house when Ellancer McGrady was cooking powder cocaine into cocaine base. According to Petty, Hughes stated that McGrady asked Waters for a 9 millimeter pistol that she was carrying, that Waters handed McGrady the gun, and that McGrady laid it on the floor while he cooked the cocaine. On cross examination, Petty admitted that he could not remember who else was present at the interview, and that the interview had not been tape recorded. Although "notes were taken," Petty had not personally take any notes during the interview and he did not have any notes of the interview with him during his testimony. Petty also testified as follows:

> Defense Counsel: And I believe your testimony was that [Hughes] said that [Waters] had a gun in her waistband and that she put it down; is that right?
> Petty: I'm not sure if she put it down or if she gave it to Lance. I don't recall exactly. I don't have the interview on me.

At the conclusion of the hearing, the Government

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

consented to McGrady's motion to strike the references in the presentence report to all the weapons except for the 9 millimeter pistol. The district court denied McGrady's objection to the reference to the 9 millimeter gun. The district court explained its sentencing of McGrady as follows:

> In this matter, the Court finds the probation officer has accurately calculated the offense level at 38, finds that under the preponderance of the evidence, the enhancement under 2D1.1(d)(1) is appropriate, likewise, the role in the offense adjustment, so the calculation comes out to 44 reduced to 43 as that is the maximum.

The court's explanation of the evidence it relied upon for its sentencing determination is somewhat unclear, but the *only* evidence presented at sentencing was Officer Petty's hearsay testimony. Although hearsay evidence is admissible at sentencing if it is accompanied by "sufficient indicia of reliability to support its probable accuracy," in this case we do not believe there were sufficient indicia of reliability.

Shameca Hughes testified at length during the trial, but did not mention any firearms. She did not testify at all at the sentencing hearing. Officer Petty's testimony took place nearly two years after his interview with Hughes. Furthermore, he had no contemporaneous documentation of the interview. Most importantly, when asked about his own testimony, which he had given just moments earlier, he was unsure what Hughes had told him during the interview. Given the lack of certainty and lack of corroborating evidence, this hearsay evidence was not reliable.

**9 Because Petty's testimony was the only evidence of McGrady's possession of a firearm, the court clearly erred in holding that the Government had proven by a preponderance of the evidence that § 2D1.1(b)(1) applied. We thus vacate McGrady's sentence and remand to the district court for resentencing. [FN2] On resentencing, the Government may put forward, and the district court may consider, any other relevant evidence demonstrating that McGrady possessed a weapon. *See United States v. Bell,* 5 F.3d 64, 67 (4th Cir.1993). Of course, McGrady may put forward rebuttal evidence. The court must then weigh the evidence and determine whether § 2D1.1(b)(1) applies. If the Government does not offer any new evidence, the court shall find that § 2D1.1(b)(1) does not apply, and resentence McGrady accordingly.

FN2. Appellants also argue that the district court failed to explain adequately the reasons underlying its decision to impose an enhancement. Because we find that the hearsay testimony was insufficient to support enhancement, we need not address this contention. We do note, however, that:
Under the Sentencing Reform Act, "[t]he court, at the time of sentencing, shall state in open court the reasons for its imposition of a particular sentence." 18 U.S.C. § 3553(c). "Reasons" means something more than conclusions.... Where substantial questions are raised respecting whether a defendant possessed a firearm during the commission of a drug offense within the meaning of the Guidelines, the sentencing court should explicitly state the reasons why enhancement under the guidelines is appropriate.
*United States v. Apple,* 915 F.2d 899, 914-15 (4th Cir.1990) (internal citations omitted).

B.

Appellants argue that no sufficiently reliable evidence supported the district court's attribution to them of more than 1.5 kilograms of cocaine base. A preponderance of the evidence standard governs the district court's determination of drug quantities for sentencing purposes. *United States v. Ricco,* 52 F.3d 58, 62 (4th Cir.1995). We review the district court's determination for clear error. *Id.*

Appellants concede that there was sufficient evidence at trial to prove that Ellancer McGrady possessed four to six kilograms of *powder* cocaine and that he cooked it into cocaine base. At the sentencing hearing, the court asked the prosecutor to offer evidence as to how much four to six kilograms of powder cocaine would weigh after it was cooked into cocaine base. An agent testified that during his six years investigating drug activity, he had learned how cocaine powder was cooked into cocaine base from talking with individuals involved in drug activity. He testified that the cooking process, if done correctly, results in an amount of cocaine base equal in weight to the amount of powdered cocaine that was used. However, the agent admitted that he had never personally watched anyone convert cocaine powder into cocaine base, that he was not an expert on the conversion process, and that there could be weight lost in the conversion process if the wrong amount of baking soda was added. Appellants argue that this testimony provides an insufficient basis upon which

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

173 F.3d 426 (Table)
(Cite as: 173 F.3d 426, 1999 WL 95633, \*\*9 (4th Cir.(N.C.)))

Page 8

to find that Ellancer McGrady possessed four to six kilograms of cocaine *base.*

A court may estimate the amount of cocaine base attributable to cocaine powder. *See United States v. Paz,* 927 F.2d 176 (4th Cir.1991). In *Paz,* a chemist testified at trial that "100 grams of cocaine would yield approximately 88 grams of cocaine base." *Id.* at 180. We upheld the use of this conversion ratio even without direct evidence of the weight after conversion. *Id.; see also Ricco,* 52 F.3d at 63. In this case, even if the district court's adoption of a one-to-one conversion rate, which assumed a "perfect" cooking process, constituted error, the court would have reached the same conclusion, i.e., that McGrady possessed and distributed more than 1.5 kilograms of cocaine base, under the lower conversion rate that we approved in *Paz* and *Ricco.* [FN3] The base offense level of 38 would thus be unaffected. When a court erroneously figures the amount of drugs attributable to a defendant that error is harmless if it does not affect the defendant's base offense level. *See United States v. Sampson,* 140 F.3d 585, 593 (1998). Therefore, in this case any error was harmless.

> FN3. Under the 1:0.88 conversion rate approved in *Paz* and *Ricco,* 4 kilograms of powder cocaine would yield 3.52 kilograms of cocaine base.

C.

\*\*10 At the sentencing hearing, Johnson's counsel asked the court to grant Johnson a downward departure for substantial assistance despite the Government's refusal to make a § 5K1.1 motion for the departure. Defense counsel alleged that when he told the prosecutor that Anita Whiteside had approached Johnson and recanted, the prosecutor responded that the Government would not file a § 5K1.1 motion if Johnson moved for a new trial. The prosecutor presented a different version of the conversation. He asserted that the Government did not move for a downward departure because it did not consider Johnson's assistance "substantial" and because Johnson's personal contact with Whiteside violated a condition of his bond and an oral admonishment from the court to avoid Whiteside. The district court denied the motion.

A district court's refusal to depart is not reviewable unless it is imposed in violation of law or based on an incorrect application of sentencing guidelines, as occurs when the decision is grounded in the court's misperception of its authority to depart. *See* 18 U.S.C.A. § 3742(a) (1985 and Supp.1998); *United States v. Bayerle,* 898 F.2d 28, 30-31 (4th Cir.1990). [FN4]

> FN4. Johnson preliminarily asserts that we may review the district court's refusal to grant the departure because it misperceived its authority to grant the departure without a motion from the Government. To support this theory, Johnson quotes the district judge's statement that he "could not grant Defendant Johnson's motion for downward departure 'in the absence of some motion from the government.' " Brief of Appellants at 47 (quoting J.A. 1329). Johnson quotes the court out of context. The court stated that it did not believe it could grant Johnson's request to be allowed to *voluntarily surrender* to authorities without a motion by the government.

Section 5K1.1 of the Sentencing Guidelines provides in pertinent part that *"[u]pon motion of the government* stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." *Id.* (emphasis added). A district court may consider a departure for substantial assistance without a motion only if the defendant first makes a substantial threshold showing that the Government's refusal to make the motion is based on an unconstitutional motive or is not rationally related to a legitimate governmental objective. *United States v. Maddox,* 48 F.3d 791, 796 (4th Cir.1995).

Johnson concedes that he cannot make a substantial threshold showing that the Government had unconstitutional motives. Brief of Appellants at 48 n. 6. In light of this concession, we turn to Johnson's attempt to make a substantial threshold showing that the Government's refusal to make the motion was not rationally related to a legitimate government objective. Reasonable minds could conclude that Johnson's help in the Government's seizure of three to four ounces of cocaine did not constitute "substantial" assistance. Refusing to move for a departure for substantial assistance if the defendant has not provided "substantial" assistance is clearly rationally related to the legitimate objective of securing a defendant's help in prosecuting other matters. *See Maddox,* 48 F.3d at 796-97.

Johnson's contrary argument, distilled to its essentials, is that when a court disagrees with the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Government's determination that a defendant's assistance is not "substantial" enough to warrant a motion for downward departure, the court should override that decision by finding that the decision was not rationally related to legitimate Government objectives. That position contravenes the language of § 5K1.1, which vests the authority to make the threshold determination about whether a defendant's assistance was substantial enough to warrant a motion for a downward departure with the Government, not the court. Although we can imagine a situation in which a defendant's assistance is so substantial that the Government's refusal to move for a departure could only be described as arbitrary, that is not the case here, where Johnson did not testify at trial and where his assistance led to the seizure of only three to four ounces of cocaine.

**11 In sum, we cannot conclude that Johnson has made a substantial threshold showing that the Government's refusal to make the motion was based on an unconstitutional motive or was not rationally related to a legitimate governmental objective. Absent such a showing, the district court had no authority to grant a departure for substantial assistance without a motion by the Government, and certainly did not err in refusing to do so.

IV.

For the foregoing reasons, the convictions of all appellants are affirmed. Ellancer McGrady's sentence is vacated and remanded for proceedings consistent with this opinion. The sentences of all other appellants are affirmed.

*AFFIRMED IN PART AND VACATED AND REMANDED IN PART*

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works